**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Civil Case Action No. 3:21-cv-319**

WES JOHNSON, and TAMEKIA
BOTTOMS, individually and on behalf of all
other similarly situated, The AAA Carolinas
Savings & Investment Plan and The Auto
Club Group Tax Deferred Savings Plan,

    Plaintiffs,

v.

CAROLINA MOTOR CLUB, INC. d/b/a
AAA Carolinas and THE AUTO CLUB
GROUP, INC.,

    Defendants.

**CLASS ACTION AMENDED
COMPLAINT**


**JURY TRIAL DEMANDED**

1.    Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. § 401 ("401(k) plans"). These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment. To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et. seq.* ("ERISA").

2.    The Defendants chose to accept the benefits of federal and state tax deferrals for their employees via a 401(k) plan, and the owners and executives of Defendant organizations have benefitted financially for years from the same tax benefits. However, Defendants have not

1

followed ERISA's standard of care. This lawsuit is filed after careful consultation with experts and publicly available documents to return benefits taken from Plan participants by Defendants.

3.     Although ERISA has a reputation for being notoriously complicated, at its core the issue is simple. Defendants did not act reasonably and consistently with ERISA's provisions, costing Plan participants and beneficiaries millions of dollars, by: (1) breaching multiple fiduciary duties owed to Plan participants, broadly expressed as incurring excessive fees that were paid by AAA's employees who participated in the Plan; (2) failing to diversify (an independent basis of liability, separate from a breach of the general duty of prudence imposed on trustees); (3) engaging in prohibited transactions with parties in interest; and (4) failing to monitor co-fiduciaries.

4.     This case is another example of a large plan with bargaining power filling their 401(k) plan with expensive funds when identical, cheaper funds were available, which the plan had more than sufficient bargaining power to obtain.  This state's district court's have already recognized the validity of such a lawsuit in a case that has since been cited throughout the nation. *Kruger v. Novant Health, Inc.*, 131 F.Supp.3d 470 (M.D.N.C. 2015).

5.     In addition, this case presents a unique optic.  The plan at issue was originally for the benefit of AAA Carolina's employees.  When AAA Carolinas merged into another company, the two companies' plans merged.  At that moment, even though the acquiring company (Auto Club Group) had a plan about fifteen times larger, it had lower administrative costs than AAA Carolina's plan.

6.     Plaintiffs Wes Johnson and Tamekia Bottoms, individually and as a representative of a class of similarly situated persons, and on behalf of the AAA Carolinas Savings & Investment Plan and its successor the Auto Club Group Tax Deferred Savings Plan (collectively, "the Plan"), bring this class action against the Plan's fiduciaries.

2

7.     The scope of Plaintiffs and/or class members in this case is limited to members of the AAA Carolinas Savings & Investment Plan and members of the Auto Club Group Tax Deferred Savings Plan who were previously members of the AAA Carolinas plan. This scope does not extend to members of the Auto Club Group Tax Deferred Savings Plan who were not members of the AAA Carolinas Plan.

8.     Defendants are Carolina Motor Club, Inc. d/b/a AAA Carolina and The Auto Club Group, Inc..

9.     Defendants made imprudent decisions in the management of their ERISA sponsored retirement plan based on information obtained by Plaintiffs' counsel from Defendants' Forms' 5500 "Annual Report of Employee Benefit Plan" sent to the U.S. Treasury and the U.S. Department of Labor.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the Plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain appropriate equitable and monetary relief as set forth in 29 U.S.C. § 1109.

11.     This case presents a federal question and, therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132 (e)(1)(F).

12.     Venue is proper pursuant to 29 U.S.C § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the District where the Plan is administered, where breaches of fiduciary duties giving rise to the actions occurred, and where Defendants may be found.

13.     Although some ERISA claims for denial of benefits require claimants to exhaust administrative remedies, no such requirement applies to breaches of fiduciary duties. As such, this

Court has jurisdiction of this case without plaintiffs having to show that they have exhausted administrative remedies.

14.     The Class Period is yet to be determined, and it will need to be ferreted in discovery. ERISA traditionally has a six year statute of limitations, but in this case the Plan had and has an ongoing duty to rectify its deficiencies that creates a continuing duty and tolls the statute, so the Class Period will ultimately begin when the Plan begin committing the breaches described herein.

## THE PARTIES

### Plaintiffs

15.     Plaintiff Wes Johnson is a citizen and resident of North Carolina. During his employment, he participated in the Plan and invested for his retirement in the Plan.

16.     Plaintiff Tamekia Bottoms is a citizen and resident of North Carolina. During her employment, she participated in the Plan and invested for her retirement in the Plan.

17.     As stated above, the scope of similarly situated plaintiffs for the purposes of class membership extends only to people who were members of the AAA Carolinas Savings and Investment Plan, and members of the Auto Club Group Tax Deferred Saving Plan who also belonged to the AAA Carolinas Plan. The scope does not extend to include members of only the Auto Club Group Tax Deferred Saving Plan.

18.     Each plaintiff has standing to bring this action because each of them participated in the Plan during the class period and was injured by Defendant's unlawful conduct and failure to provide a prudent plan. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties.

4

**The Plan**

19.     Carolina Motor Club, Inc., d/b/a AAA Carolinas ("AAA Carolinas") established the AAA Carolina Savings and Investment Plan ("AAA Carolinas Plan") on December 1, 1986, and last amended on January 1, 2019.

20.     The AAA Carolina Plan is a defined contribution plan within the meaning of 29 U.S.C. § 1002(34) and was open to all employees of AAA Carolinas and its subsidiaries, excluding temporary and seasonal employees.

21.     A merger took place on January 4, 2021, under which the AAA Carolinas Plan was absorbed into the Auto Club Group Tax Deferred Saving Plan ("ACG Plan").

22.     The plan resulting from the merger ("the Plan") is the centerpiece of this action. The Plan is a defined contribution plan within the meaning of 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, as well as any income, expense, gains, losses, and/or forfeitures of accounts which may be allocated to each participant's individual account.  As such, the Plan's retirement benefits are based solely on the amounts allocated to each individual's account.

23.     The Plan is held as a trust ("the Trust") according to both the plan documents and lines 9a and 9b of the Plan's certified Forms 5500.

24.     The "Plan" as it is relevant to this case, to be clear, applies to members of the AAA Carolinas Plan at any time, and members of the ACG Plan who were also members of the AAA Carolinas Plan.

25.     The Plan is a tax-qualified plan under 26 U.S.C. § 401, and thus is a qualified 401(k) profit sharing plan.

26.     According to the Plan's Forms 5500, AAA Carolinas and the Auto Club Group, Inc. ("ACG") served, at one time or another, as the Plan sponsors and trustees.

## Defendants

27.     AAA Carolinas is an American automotive association founded in 1922 that provides members with roadside assistance, insurance products, travel offerings, and banking and financial services.

28.     AAA Carolinas is located in Charlotte, North Carolina.

29.     AAA Carolinas served as the original Plan sponsor, as noted at Part II, line 2a of each of the Forms 5500 filed with the U.S. Treasury and the Department of Labor in the years 2009-2019.

30.     ACG is the second largest AAA club in North America, with 14 million members in 14 states, 2 U.S. territories, and the Canadian province of Quebec.  ACG provides the same product and service offerings as AAA Carolinas.

31.     ACG is located in Dearborn, Michigan.

32.     Based on Form 5500 filings, ACG sponsors the Plan.

33.     These three organizations are herein referred to together as "defendant organizations."

34.     Based on the terms of the merger and a review of the Plan 2019 Form 5500 filing, ACG either itself or in conjunction with AAA Carolinas, are the plan sponsor within the meaning of 29 U.S.C § 1002(21)(a) for several reasons.

35.     First, these organizations are named fiduciaries under the Plan. Second, they exercised discretion and control over Plan management, and/or authority or control over management or disposition of Plan assets. Third, they were responsible for monitoring other fiduciaries. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

6

36.     AAA Carolinas Board and ACG's Board, and each Board member during the Class Period, is or was a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management, and/or had authority and control over management or disposition of Plan assets through choosing investments, choosing fund classes, and controlling Plan costs.

37.     There exist a number of parties who are non-named Defendants, but who are nonetheless relevant to the facts of this case and may have information in their control and possession. These parties include Capfinancial Partners, LLC d/b/a/ Captrust Financial Advisors ("Captrust") as a covered service provider ("CSP") investment advisor, Wells Fargo ("Wells Fargo") as both a recordkeeper ("Wells Fargo (recordkeeper)") and an investment advisor ("Wells Fargo (advisor)"), and Cherry Bekaert ("Cherry Bekaert") as an accounting firm performing audits.

38.     Again, these parties are relevant and are likely to have information relevant to these claims, but they are not named as defendants because AAA Carolinas and ACG remain responsible for the overall selection and monitoring of all service providers and have full discretion and control over Trust assets and Plan providers.

## DEFINITIONS AND STATUTORY CITATIONS

39.     The following section will explain the relevant working terminology, definitions, and statutory provisions applicable to this Complaint. Unfortunately, there will be some overlap and repetition, but the undersigned has attempted to make this section helpful to the Court to the extent the parties can have an understanding of a working vocabulary going forward.

40.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a)(1) states, in relevant part, that: a fiduciary shall

discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

 

(A) for the exclusive purpose of:

    i.   Providing benefits to participates and their beneficiaries; and

    ii.  Defraying reasonable expenses of administering the plan;

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

41.    ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other fiduciaries of the Plan. 29 U.S.C. § 1104(a)(1). These fiduciary duties are "the highest known to the law." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (citation and quotation marks omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

42.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).

43.    The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).

8

Therefore, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.* In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Continental Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

44.     ERISA recognizes co-fiduciaries and related liability. 29 U.S.C. § 1105(a) states, in pertinent part, that:

> (A) In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to that same plan in the following circumstances:
>
> > i. If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
> >
> > ii. if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > iii. if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

45.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). The prudent person standard in ERISA requires "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments" within a "reasonable time". *Tibble*, 135 S. Ct. at 1828.

9

46. Fiduciaries are obligated to assemble a diversified menu of investment options. 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). Each investment option is generally a pooled investment product – which includes mutual funds, collective investment trusts, and separate accounts – offering exposure to a particular asset class or sub-asset class.

47. Pursuant to the **prudent investor rule**, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function."). The Introductory Note to the Restatement's chapter on trust investment further clarifies:

> (A) [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule. This is done to reflect the importance of market-efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets …. The duty to be cost conscious requires attention to such matters as the culmination of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles. In addition, active management strategies involve investigation expenses and other transaction costs … that must be considered, realistically, in relation to the likelihood of increased return from such strategies. Restatement (Third) of Trusts ch. 17, intro. note (2007). Where markets are efficient, fiduciaries are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a fiduciary may consider higher-cost, actively managed mutual funds as an alternative to index funds, "[a]ctive strategies … entail investigation and analysis expenses and tend to increase general transaction costs …. [T]hese added costs … must be justified by realistically evaluated return expectations." *Id.* § 90 cmt. h(2).

10

48.    As such, a prudent investor may not select higher cost investments when lower cost alternatives are available.

49.    There are two major categories of expenses within a defined contribution plan: investment management expenses and administrative expenses.

50.    **Investment management expenses** are asset-based fees that are charged by a mutual fund to compensate the investment manager and fund company for managing the assets of the fund and are a common and equivalent component among all share classes within a fund's expense ratio.

51.    **Administrative expenses** are the expenses a plan incurs for administration services such as recordkeeping, accounting, legal, and trustee services. These fees can be paid out of the Plan's investments or directly by the Plan's participants or Plan sponsor.

52.    **Expense ratio** is the annual operating expenses of a plan reflected as a percentage of the plan's assets and includes any SEC Rule 12b-1 fees, and other forms of revenue sharing, etc., in addition to investment management fees. These fees are directly deducted from the mutual funds returns. On average, 82% of overall fees within a plan are investment expenses as expressed by the expense ratio, while administrative fees on average make up only 18% of total fees.

53.    **12b-1 fees** are a component of the expense ratio charged to participants to pay providers such as brokers and advisors for the marketing and distribution of a fund and may be used to pay other plan service providers. This fee is unique to each share class and can range from 0.00% to 1.00%.

54.    **Sub-transfer agency** (Sub-T/A) fees are a payment to a third party administrator (TPA) or a recordkeeper who holds an omnibus account at the mutual fund company for maintaining records of a plan's individual participants. Similar to 12b-1 fees, this fee is unique and specific to each share class.

11

55. **Omnibus account** refers to the account designated to hold the securities and assets of a plan for the benefit of the participants. Plan participants are trust beneficiaries, but the securities are registered to the trust and not individually or in their name. Securities are traded daily, and values are sent to the recordkeeper to update participants' accounts and websites.

56. ERISA defines a **covered service provider** (CSP) as an entity that provides brokerage, consulting, or management services for which the provider enters into a contract with the plan and reasonably expects $1,000 or more in direct or indirect compensation. These services include selecting investment options and recordkeeping.

57. A **recordkeeper** maintains software to hold accounting records to match the omnibus trust assets. The recordkeeper performs "daily valuations" in their accounting software to reflect the allocations of earnings of the trust assets for which each worker is entitled. It is essentially the 401k plan's bookkeeper. The recordkeeper tracks who is in the plan, what they own, and what money is going in and out.

58. The recordkeeper acts as the heart and soul of the plan, making sure that the money and information goes where it is supposed to go. The recordkeeper typically provides information about the investments and a website. However, the recordkeeper is not necessarily a fiduciary. Rather, the fiduciary duties are typically relegated to the employer. In this case, the fiduciaries are the Defendants who are herein named.

59. **Recordkeeping expenses** are typically the largest administrative expense, followed by custodial/trustee services. Records of participants are held so that aggregate trust actions at an omnibus level can be accounted for each business evening.

60.     A **custodian** is responsible for holding an omnibus account of the plan's assets, to facilitate the paying of plan providers from the investments, and for the safekeeping of assets. It is analogous to a bank. A custodian does not provide investment advice.

61.     Recordkeeping and custodial services are essentially commodities. Eric Droblyen, *Evaluating 401k Providers: Separating Commodity from Value-Added Services*, The Frugal Fiduciary Blog (Feb. 10, 2015). Fiduciaries should, therefore, select recordkeeping and custodial service providers based upon which provider can provide these services at the lowest cost to the plan.

62.     To achieve this, a plan can periodically engage in a competitive bidding process by submitting a Request for Proposal (RFP) to multiple service providers. According to the Department of Labor ("DOL"), regular monitoring of costs and review of costs is ultimately the best means of controlling plan costs. Dep't of Labor Employee Benefits Security Administration, *Understanding Retirement Plan Fees and Expenses*, at 11 (December 11), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf.

63.     **Asset-based compensation** occurs when a broker, recordkeeper, or custodian is paid as a percentage of plan assets. This pay is thus a percentage of assets, and the assets consist of 1) salary that employees have paid into the plan, 2) employer matching dollars to the trust, 3) interest and dividends the trust earns on securities, and 4) realized and unrealized capital gains on trust investments. This method of payment virtually guarantees pay increases to providers when employees save each pay period without regard to increases in labor required by or liability exposure to these providers.

64. **Fixed dollar** or **per head compensation** occurs when a recordkeeper or custodian is paid a certain, set amount per participant without regard to 1) the amount each participant saved to the plan, 2) the amount the plan and trust earns, and 3) the amount the employer deposited into the plan and trust.

65. Administrative expenses can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in a plan, in a practice known as "**revenue sharing**".

66. Fees paid directly to service providers out of the plan assets are referred to as "Direct Compensation"; monies received by service providers pursuant to a revenue-sharing scheme are referred to as "Indirect Compensation." 29 C.F.R. § 2550.408b-2(c)(viii)(B); IRS Form 5500, Schedule C.

67. Eric Droblyen, July 24th, 2019, in *Revenue Sharing – 5 Reasons for 401(k) Fiduciaries to Avoid it* https://www.employeefiduciary.com/blog/avoid-revenue-sharing states: "Following a groundswell in excessive 401(k) fee litigation over the past decade, employers are demanding more transparent and fair provider fees to help them stay out of trouble. This trend has led to a decline in the use of revenue sharing." Additionally, Droblyen says that revenue sharing 1) limits investment options, 2) is often unfair, and 3) can outstretch service level.

68. Fees or compensation to plan service providers can become excessive when they are NOT based on 1) labor and material costs plus 2) a reasonable profit.

69. Plans that allow providers or vendors to enjoy revenue sharing pay those providers asset-based compensation, not fixed dollar or per head pay.

14

70.     If providers are paid based on revenue sharing, over time as assets rise in value, services provided by these providers must increase commensurately or a violation of 26 U.S.C. § 408(b)(2) occurs, creating an IRS and DOL prohibited transaction for each year of overpayment.

71.     Most, but not all, forms of direct and indirect compensation are certified and filed annually by the Defendants on the Plan's Annual Report or **Form 5500**, which is the form that must be filed for employee benefits plans under 29 CFR § 4065. If not on this form, the info will be in the audited financial statements of ERISA-compliant 401(k) plans.

72.     Fiduciaries should use a competitive bidding process, such as an RFP, to select a new recordkeeper. Fiduciaries must also monitor recordkeeping costs and services at reasonable intervals, such as every year or two. The key is that the fiduciary examination reflects the current circumstances, e.g., changes in market pricing, the size of the plan as it grows, the number of covered participants, and technological efficiencies garnered by recordkeepers. Cost savings from technological efficiencies and innovation have allowed recordkeepers to decrease their participant fees by 50% since 2006.

73.     The plan sponsor must monitor the plan's recordkeeping costs according to the duties of prudence, loyalty, and the plan documents.

74.     The plan sponsor must regularly leverage the size of the plan and negotiate for lower costs. An ERISA budget account is a commonly used way for plan sponsors to capture all revenue sharing payments, whenever a plan makes the poor decision to allow revenue sharing. This account serves multiple functions: 1) plan sponsors can readily account for and monitor all revenue sharing payments, 2) the account ensures service providers negotiate for a receive only reasonable fees each year, and 3) the account allows for excess payments to be credited back to participants.

15

*75.* Under trust law, plan sponsors must "avoid unjustified costs" and choose investments with the lowest expense ratios, *particularly when the two investments are the same.*

76. The general duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are supplemented by 29 U.S.C § 1106, which provides a detailed list of prohibited transactions that constitute *per se* violations of ERISA. 29 U.S.C. § 1106(a)(1), in pertinent part, states that:

> (A) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> > i. sale or exchange, or leasing, of any property between the plan and a party in interest; …
> >
> > ii. furnishing of goods, services, or facilities between the plan and a party in interest;
> >
> > iii. transfer to, or use by or for the benefit of a party in interest, of any assets of the plan ….

77. 29 U.S.C. § 1002(14) defines a **party in interest** to include fiduciaries or employees of a plan itself, service providers, employers whose employees belong to a plan, employee organizations, relatives of the above-described individuals, and those with various ownership stakes in certain corporations, partnerships, and joint ventures.

78. 29 U.S.C. § 1106(b) relates to transactions between the plan and a fiduciary of the plan, providing that:

> A fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account; (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests

16

are adverse to the interests of the plan or the interests of its participants or beneficiaries; or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

79. The broad asset classes generally include fixed investments, bonds, stocks, and real estate.

80. Money market funds, guaranteed investment contracts, and stable value funds are examples of **fixed investments.**

81. **Bonds** are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the credit risk associated with the particular borrower.

82. **Equity**, or **stock**, investments are generally defined by three characteristics: 1) where they invest geographically (i.e., whether they invest in domestic or international companies, or both); 2) the size **of** the company they invest in (generally categorized as small cap, mid cap, or large cap); and 3) their investment style, i.e., growth, value, or blend.

83. **Target-date funds** assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.

84. **Mutual funds** are investment funds governed by the U.S. Securities & Exchange Commission ("SEC") under the Investment Company Act of 1940.

85. **Index funds** are low-cost mutual funds that invest in a specific basket of underlying investments so as to match or track a specific broadly used market index such as the S&P 500. Index funds are known as "passive" funds because there is no portfolio manager actively buying and selling securities in an attempt to opportunistically time the market. Passively managed index funds are referenced in The American Law Institute, 1992, Restatement of the Law Third, Trusts

17

– Prudent Investor Rule: "The greater the trustee's departure from one of the valid passive strategies, the greater is likely to be the burden of justification and also of continuous monitoring."

86. **Passive funds**, popularly known as "index funds", seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013).

87. By following the passive fund strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id*.

88. Index funds, therefore, offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id*.

89. **Actively managed funds,** on the other hand, use portfolio managers to pick individual stocks or bonds within a particular asset or sub-asset class to try and beat the market through superior investment selection. *Id.* at 485-86. S&P Dow Jones Scorecard writes "[o]ver the long-term investment horizon, such as 10 or 15 years, 80% or more of active managers across all categories underperformed their respective benchmarks."

90. Actively managed funds are typically much more expensive than index funds but offer the potential to outperform the market, although this potential is more often than not not realized.

91. Trust law imparts a higher burden on fiduciaries when selecting actively managed funds (whose average fees are about 1% per year) that utilize a portfolio manager to manage a median of 80 to 90 stocks in an effort to beat a particular index. The extra burden exists because fiduciaries are effectively betting with participant's assets that a fund manager has the skill to outperform a significantly less expensive index. Since expected return of stocks and bonds is effectively 5% annually over time, a 1% charge equates to 20% of participants expected returns.

Case 3:21-cv-00319-MOC-DCK   Document 7   Filed 08/18/21   Page 18 of 80

92.     **Loaded funds** refer to funds that charge 12b-1 fees of over 0.25% per year

93.     **No-load funds** refer to funds that may contain a minimal 12b-1 fee of no more than 0.25%, and no front or back-end loads.

94.     **Share classes** are separate product units of a mutual fund portfolio created for different distribution methods and service levels. Each share class within a mutual fund portfolio is *identical* in every respect except for the net returns and the distribution and service costs, such as 12b-1 fees and shareholder service fees. Because these costs are reflected in the net returns, the performance of each share class will be higher or lower solely based on these expenses: the higher the expenses, the lower the returns. Broadly speaking, share classes are broken into institutional and retail categories.

95.     An **institutional share class** is a "no-load" class of shares that is available to large investors. Typical institutional shares have higher minimum investment requirements but lower fees than their retail counterparts that are available to the general public, where minimum required purchases range from $0 to $2,500.

96.     Institutional share classes commonly have symbols such as "I" or "R6" at the end of their names.     At     https://www.morningstar.com/articles/823640/how-to-access-funds-with-high-minimum-investments, financial services company Morningstar wrote "[y]ou may be surprised to learn that many times, the institutional shares classes are held by retail investors." Regarding minimum required purchase amounts, these are typically waived on request. Morningstar went on to say "[s]ometimes an advisor will bundle clients' accounts into a larger 'omnibus account' to meet the higher minimum investment on lower-cost shares…."

97.     A **retail share class** is a class of shares intended for individual investors with lower amounts to invest and higher service needs.

19

98. Retail share classes commonly have front- or back-end loads and 12b-1 and/or shareholder service fees of 0.25% or more.

99. Retail share classes commonly have symbols such as "A", "Adv", or "R1" through "R4" at the end of their names.

## DEFENDANTS' CONDUCT

**Defendants breached their duty/prudence obligations by maintaining excessively expensive funds when superior alternatives existed, and failing to properly monitor CSP's, allowing them to overcharge the Plan with fees.**

100. The duty of loyalty requires fiduciaries to act "solely in the interest" of plan participants and beneficiaries, and "for the exclusive purpose of providing benefits to participants" and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

101. Defendants inexplicably flooded the Plan with extremely expensive, often underperforming investment options for participants to choose from, all while they had the ability to obtain much cheaper and more lucrative investment options. Defendants refused to obtain cheaper funds for over a decade, aside from a small change in direction in or around 2018. Defendants never put the recordkeeping contract for the Plan up for a bid to bring in more competitive offers from other service providers. Additionally, Defendants allowed Captrust, Wells Fargo (recordkeeper), and Wells Fargo (advisor) to take large amounts of money from the Plan and its participants through excessive fees and compensation mechanisms, much higher than those warranted by the amount of work these service providers were completing. These excessive fees and the costs of acquiring overly expensive funds were paid directly by the Plan and its

participants. For the entire class period, Defendants neglected their duties and allowed CSP's to make immense amounts of money off of Defendants' own employees.

102.    As was briefly discussed above in the definition section, the *only* difference between retail share classes and institutional share classes is their fees and other charges. The underlying assets in the fund are the same, with these costs being the only difference.

103.    Retail share classes are identified by the suffixes A, Adv, and R1 through R4. Institutional share classes are identified by the suffixes I and R6.

104.    Defendants had an obligation to "avoid unjustified costs" and obtain the cheapest funds possible, particularly when two or more funds were identical in all meaningful aspects.

105.    As such, Defendants should try and obtain institutional share classes, when possible, as opposed to their retail share class equivalents.

106.    There is no evidence that Defendants tried to get better funds for the Plan, at least until either 2018 or 2019. But for the preceding decade, Defendants continually imprudently limited their Plan participants' investment choices to high-cost retail share classes, and when institutional shares were offered, they were the worst performing of the available options.

107.    Defendants used consistently lower performing, more expensive retail share classes, as opposed to institutional share classes, causing increased fees to the participants as they attempted to save more.

108.    Based on Defendants' Forms 5500, the fiduciaries of the defendant organizations never asked their recordkeepers or advisors to reduce their compensation. Of course, as a profit seeking non-fiduciary entity, these recordkeepers and advisors had no incentive to recommend that Defendants adopt cheaper funds or a more Plan-participant friendly compensation structure for themselves.

21

109.    The differing cost structures of these identical funds exist to allow large customers, such as this Plan, to take advantage of scale as investments are made. Service providers are often willing to waive minimum purchase requirements that often come with institutional funds as a way of incentivizing their adoption into plans.

110.    As will be shown below, it is possible that Defendants had an incentive to push these higher-cost funds onto Plan participants because it would allow the recordkeeper and advisor to charge the fees to participants instead of the defendant organizations themselves.

111.    Discovery will reveal more specific details of the communications and contractual relationships behind these decisions but based on the Forms 5500 Plaintiffs have access to, the following examples prove demonstrative and concerning.

**Maintaining unnecessarily expensive funds when cheaper, identical funds were available, as well as failing to remove inferior funds, was imprudent.**

112.    For Plan year 2009, the fund that held the second largest share of Trust assets, amounting to $2,130,608, was the Allianz NFJ Dividend Value R retail share class.

113.    Of the 4 available Allianz NFJ Dividend Value funds to choose from, the R class that Defendants picked was the worst performing, highest cost, and lowest dividend yield option. As stated above, the underlying assets were identical, as were the names of the listed fund managers.

| Name | 2008 | 2007 | 2006 | 2005 | 2004 | Yield 12-Mo | Expense | Assets ($millions) | Net-Asset Value | Manager Name | True No-Load |
|------|------|------|------|------|------|-------------|---------|--------------------|-----------------|--------------|--------------|
| Allianz NFJ Dividend Value A | -36.25 | 4.27 | 24.11 | 11.48 | 13.88 | 3.04 | 1.07 | 1765.8 | 11.35 | Fischer/Oliver/McKinney | N |
| Allianz NFJ Dividend Value Admin | -36.16 | 4.35 | 24.24 | 11.65 | 14.17 | 3.09 | 0.97 | 1095.4 | 11.47 | Fischer/Oliver/McKinney | N |

| Allianz NFJ Dividend Value Instl | -36.06 | 4.64 | 24.64 | 11.86 | 14.45 | 3.32 | 0.72 | 2296.6 | 11.43 | Fischer/Oliver/McKinney | Y |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Allianz NFJ Dividend Value R (Defendants')** | **-36.46** | **3.98** | **23.79** | **11.14** | **13.67** | **2.82** | **1.32** | **224.3** | **11.31** | **Fischer/Oliver/McKinney** | **N** |

114. Also in Plan year 2009, Defendants added the American Beacon Small Cap Value Adv share class, a retail share class known by the ticker AASSX.

115. Since it was added to the Plan in 2009, Defendants are assumed to have reviewed its history in 2008. This particular fund was incepted on 5/1/2003, meaning decision-makers only had five years' worth of stock selection performance data with which to evaluate the possible risks and returns.

116. The two older "sister" share classes of the same fund had much earlier inception dates of 1998 and 1999, meaning there was approximately double the amount of valuable decision-affecting data stemming from those share classes.

117. Even assuming that the American Beacon Small Cap Value fund was a prudent investment choice, the share class Defendants chose was the worst option of the three.

118. Defendants' choice had a lesser dividend yield, was almost 60% more expensive when comparing expense ratios, and had a negative alpha value (meaning the manager lagged behind their benchmark expectations) while the other two classes had positive alpha values. It is clear that, even within this American Beacon set, alternatives existed that would've better served Plan participants.

| years to monitor | St dev (risk) | alpha (2008 back) | yrs of data | expense | 12 Mo Yield | Name |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| *no skill* | *4.33* | *(1.73)* | *5.00* | *1.31* | *0.51* | ***American Beacon Small Cp Val Adv (Defs' choice)*** |
| 84 | 6.02 | 1.31 | 9.00 | 1.14 | 0.63 | American Beacon Small Cp Val Inv |
| 118 | 6.03 | 1.11 | 10.00 | 0.83 | 0.83 | American Beacon Small Cp Val R5 |

119.    Additionally, in Plan year 2009 Defendants chose to include a S&P 500 index fund in the Plan.

120.    Index funds investing in the same iconic financial market indicator, such as the S&P 500, differ *only* by their expenses, since the underlying indicator is the same.

121.    The index chosen by the Defendants was the BNY Mellon S&P 500 Index Fund a/k/a/ the Dreyfus S&P 500 Index Fund (ticker PEOPX).

122.    Alternatively, the Vanguard 500 Index Admiral is the largest index fund in the world with the most investor assets, amounting to $51 billion compared to the $2.4 billion invested in Defendants' choice.

123.    Comparing these two funds reveals that they both have a correlation of 1.00, meaning their daily and monthly standard deviations are the same (1.25% and 4.34%, respectively).  The perfect correlation is because both funds are tied to the same index.

124.    However, their annualized returns are drastically different, with a 7.35% return for Vanguard and a 6.87% return for Defendants' BNY Mellon fund. The only cause of this difference in return is the higher underlying costs included in the BNY Mellon fund.

| Name | Ticker | PEOPX | VFIAX | Annualized Return | Daily Standard Deviation | Monthly Standard Deviation |
|------|--------|-------|-------|-------------------|--------------------------|----------------------------|
| BNY Mellon S&P 500 Index **(Defendants')** | PEOPX | - | 1.00 | 6.87% | 1.25% | 4.34% |
| Vanguard 500 Index Admiral | VFIAX | 1.00 | - | 7.35% | 1.25% | 4.34% |

125.    Defendants' retention of this BNY Mellon fund as their S&P 500 Index fund, which cost 10x more than identical cheaper funds (0.5% basis points vs. 0.05% basis points), means the Plan paid 10x more than they needed to, while yielding and earning less over a decade.

126.    To make matters worse, the Vanguard fund deducted fees of only $0.19 per day, per million invested, while Defendants' chosen fund deduced an astonishing $13.70 per day, per million invested, amounting to a 72x higher fee.

127.    These deductions were taken daily from Trust assets, including the contributions deposited into the Plan by participants, as opposed to from the corporate earnings of Defendants themselves. This imprudent choice shows indifference to the growth of Plan assets and participants interests in clear violation of ERISA.

128.    Although the previous comparison is demonstrative, the point is nonetheless made by inserting various other funds in Vanguard's place. Compiling information from the prospectus data of 11 identical S&P 500 funds that Defendants had access to at the time of their decision shows that Defendants' BNY Mellon fund was still the worst performing, most expensive option:

| Name | 2008 | 2007 | 2006 | 2005 | 2004 | Yield 12-Month | Expense | Inception |
|------|------|------|------|------|------|----------------|---------|-----------|

25

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| American Beacon S&P 500 Idx Instl | (37.08) | 5.39 | <u>15.69</u> | 4.74 | 10.77 | 1.85 | | 0.15 | 12/31/1996 |
| BlackRock S&P 500 Index Instl | (37.20) | 5.29 | 15.49 | 4.63 | 10.54 | 1.67 | | 0.31 | 4/3/1997 |
| BlackRock S&P 500 Stock | (37.01) | 5.36 | 15.60 | 4.71 | 10.68 | 1.69 | | 0.18 | 7/2/1993 |
| *Dreyfus S&P 500 Index (Defendants')* | *(37.28)* | *5.03* | *15.24* | *4.42* | *10.38* | *1.44* | | *0.50* | *1/2/1990* |
| DWS S&P 500 Index S | (37.25) | 5.22 | 15.37 | 4.47 | 10.37 | 1.55 | | 0.46 | 8/29/1997 |
| MainStay S&P 500 Index I | (37.03) | 5.18 | 15.51 | 4.61 | 10.60 | 1.55 | | 0.35 | 1/2/1991 |
| Nationwide S&P 500 Index Instl | (37.17) | 5.14 | 15.63 | 4.73 | 10.68 | 1.69 | | 0.22 | 12/30/1999 |
| Principal Large Cap S&P 500 Index Inst | (37.17) | 5.34 | 15.67 | 4.71 | 10.67 | 1.34 | | 0.25 | 3/1/2001 |
| Schwab S&P 500 Index | <u>(36.72)</u> | <u>5.50</u> | 15.67 | 4.79 | 10.70 | 1.83 | | <u>0.09</u> | 5/20/1997 |
| TIAA-CREF S&P 500 Index Instl | (36.92) | 5.40 | 15.70 | <u>4.80</u> | <u>10.79</u> | <u>2.18</u> | | <u>0.09</u> | 10/1/2002 |
| TIAA-CREF S&P 500 Index Retire | (37.10) | 5.17 | 15.36 | 4.47 | ~~10.35~~ | 1.95 | | 0.34 | 10/1/2002 |

129.    The fund with the best number for each column is underlined, and the fund with the worst number for each column is noted with a strikethrough.

130.    This imprudent decision was made so that the excessive administrative costs would be borne by participants through fees extracted from Trust assets daily.

131.    Defendants' failure in selecting appropriate share classes, leading to excessive and unnecessary fees on participants, was widespread. In the six years between 2009 and 2015, the Plan used the R3 share class of the American Funds Europacific Growth fund.

132. Data from this fund's prospectus shows that it pays 0.5% to the recordkeeper in 12b-1 marketing and distribution fees. Since this fund was part of the Plan for over half a decade, the participants were essentially paying this 12b-1 fee to market, or sell, this share class to themselves, which was clearly unnecessary and not in their interests.

133. One might assume that participants gained some sort of additional benefit in return for these fees, such as a better website, more account statements, or increased information or investing options, but this is not the case. Plan participants gained absolutely nothing by choosing the high-fee R3 fund as opposed to the *identical* R6 institutional version of the fund that had no 12b-1 fees associated with it whatsoever.

134. Additionally, Department of Labor and IRS income statements and balance sheets from Plan years 2014 and 2015 show that in 2015, Defendants moved about half of the Trust's assets from non-target date funds into the JPMorgan Smart Retirement 2030 target date series A share class. This move is notable because, prior to this change, the Plan had never before utilized target-date funds.

135. Even assuming that shifting almost *half* of the Plan's assets into a type of investment they had never explored before, Defendants violated their duties by choosing impudent share classes. When deciding which JPMorgan Smart Retirement 2030 target date series to choose, Defendants could have selected class A, Select class, or Institutional class. (Class C existed and is contained in the following chart, but this class is not permitted for use by trusts.) Defendants chose class A, the most expensive of the available options.

| ANNUAL FUND OPERATING EXPENSES 2015 JPMorgan Smart Retirement 2030 (Expenses that you pay each year as a percentage of the value of your investment) | | | |
|---|---|---|---|
| | Class A | Class C | Select Class |
| **Management Fees** | NONE | NONE | NONE |

27

| | | | |
|---|---|---|---|
| Distribution (Rule 12b-1) Fees | 0.25% | 0.75% | NONE |
| Other Expenses | 0.32 | 0.35 | 0.32% |
|    Shareholder Service Fees | 0.25 | 0.25 | 0.25 |
|    Remainder of Other Expenses | 0.07 | 0.10 | 0.07 |
| Acquired Fund (Underlying Fund) Fees and Expenses | 0.59 | 0.59 | 0.59 |
| | | | |
| Total Annual Fund Operating Expenses | 1.16 | 1.69 | 0.91 |
| Fee Waivers and Expense Reimbursements[1] | (0.25) | (0.13) | (0.10) |
| | | | |
| *Total Annual Fund Operating Expenses After Fee Waivers and Expense Reimbursement*[1] | *0.91* | *1.56* | *0.81* |

| ANNUAL FUND OPERATING EXPENSES 2015 JPMorgan Smart Retirement 2030 (Expenses that you pay each year as a percentage of the value of your investment) | |
|---|---|
| | **Institutional Class** |
| Management Fees | NONE |
| Distribution (Rule 12b-1) Fees | NONE |
| Other Expenses | 0.15% |
|    Shareholder Service Fees | 0.10 |
|    Remainder of Other Expenses[1] | 0.05 |
| Acquired Fund (Underlying Fund) Fees and Expenses | 0.59 |
| | |
| Total Annual Fund Operating Expenses | 0.74 |
| Fee Waivers and Expense Reimbursements[2] | (0.07) |
| | |
| *Total Annual Fund Operating Expenses After Fee Waivers and Expense Reimbursement*[2] | *0.67* |

136.    The "total annual fund operating expenses after fee waivers and expense reimbursement" value for class A was 0.91% per year, while the value for the Institutional class was 0.67% per year, meaning the share class Defendants chose was 36% more expensive than the other available, identical classes.

137.    Interestingly, JPMorgan pays a finder's fee to include share class A shares of this target date fund in retirement plans such as the Plan. This fact will be explored in more detail in the coming section regarding overpayment of fees to service providers.

138. Defendants' failure to utilize the lowest cost share class of the exact same mutual funds for almost all of the Trust's investments massively decreased the daily yields credited back to Plan participants. This is in direct contradiction of the stated goals of the JPMorgan Smart Retirement 2030 fund itself, which states in part "the Fund seeks high total return with a shift to current income and some capital appreciation over time as the Fund approaches and passes the target retirement date."

139. Defendants could easily have taken advantage of the free FundAnalyzer tool provided by the Financial Industry Regulatory Authority Corporation (FINRA), a private corporation that acts as a self-regulatory organization taking over some member regulation, enforcement, and arbitration operations from the New York Stock Exchange.

140. FundAnalyzer allows anyone to plug different investments into the website and get information regarding their returns and expected costs. Users can also select multiple investments and compare them using these metrics.

141. Plugging JPMorgan Smart Retirement 2030 Fund Class A and JPMorgan Smart Retirement 2030 Fund Class R6 into FundAnalyzer reveals drastic differences similar to those detailed above.

142. The Class A retail share fund has annual operating expenses of 0.86%, annual 12b-1 fees of 0.25%, and front-end sales charges that go as high as 4.5%.

143. In comparison, the Class R6 industrial share fund has annual operating expenses of 0.44%, no 12b-1 fees, and no front-end sales charges. This indicates that the R6 share class is approximately 50% cheaper and has no additional associated fees, while the A class has additional annual fees that could reach almost 5%.

144. While this decision in and of itself was imprudent, the Defendants made an equally large mistake on or around 1/1/19, when they realized they had been carrying excessively expensive

funds and made a complete departure from their previous investing approaches. (This will be discussed in detail in later sections).

145.    Defendants appear to have realized around this time that adding these JPMorgan funds as the default option in 2015 and seeding them with existing Trust assets was an imprudent mistake that cost millions of dollars.

146.    Upon this realization, Defendants made a 180 degree turn from the selection/retention approach they had been following for the previous decade and made a wholesale swap of the JPMorgan funds for an American Funds' target date series class R6.

147.    This new R6 fund was the lowest cost share class of that specific American Funds mutual fund, which is a much more prudent investment choice for Plan participants.

148.    However, upon realizing their mistake and adjusting investments, Defendants did nothing to appropriately conform to the IRS' rules regarding the repair of former participants' accounts that had been harmed over the prior 4 years. The value of these accounts that had previously cashed out of the more imprudent funds amounted to $36,278,962.

149.    This is in direct contradiction to the language of the IRS' correction program, which states in part that to maintain tax-exempt status, Defendants must "[a]pply [a] reasonable correction method that would place affected participants in the position they would've been in if there were no operation plan defects." Defendants took no such action.

150.    Not only does the federal government require corrections of this type, so does the Plan's own plan document on file at Wells Fargo (recordkeeper), which states that the Plan risks losing qualifications and tax-exempt status of the Trust if mis-operations of this sort are not corrected. (Violations of the plan document are further discussed in a following section).

**Consistently overpaying fees to covered service providers and failing to adequately monitor their activities and decisions violated the duties of loyalty and prudence.**

151. By this time is has been made clear that Defendants selected and retained share classes that had extra fees embedded in them so that their past and future yields and overall gains were significantly lower than identical funds without these extra fees. This decision harmed Plan participants by reducing the mutual funds' net asset values (NAVs) every day for over 10 years.

152. Additionally, payment of these fees was usually shifted onto the Plan participants themselves, a decision which industry academics like Professor emeritus of Finance at the Robert H. School of Business at the University of Maryland John Haslem view as intentional, since these individuals are usually less sophisticated and informed about complex financial decisions than are Defendants.

153. One can assume that Defendants retained funds with these excessive investment fees in order to require participants to pay recordkeeping and advising costs so that Defendants would receive reduced bills and invoices to pay themselves.

154. This action would clearly not be "solely and exclusively" for the benefit of Plan participants, in violation of ERISA.

155. As a specific example, Defendants consistently and persistently preferred mutual funds and Wells Fargo stable value funds that carried extra 12b-1 marketing/distribution fess and revenue sharing fees like sub-accounting and sub-T/A fees. While not per se prohibited, decisions like this require significantly more justification and oversight because they encourage the use of expensive share classes, discourages the use of low-cost index funds, and ensures unwarranted and undeserved pay increased for CSPs.

156.     In a broad sense, the teachings of world-renounced investor Warren Buffett can be illustrative. According to Buffett, a fund's expected return annually is 5%, with 3% from GDP growth and 2% from dividend yields. Using this benchmark, since at least 2009 Defendants' imprudent fund selection has reduced this 5% yield by 1% due to active management fees, 12b-1 marketing/distribution fees, sub-T/A fees, and other service/revenue sharing fees, and another 1% in the form of transaction costs, to just a 3% expected return.

157.     This combined reduction of 2%, off of an expected return of 5%, represents a 40% loss of earnings year after year due to these duty-violating decisions. This flawed fund selection and monitoring process cost 4x the revenue sharing costs overall, or an estimated $8 million over the last 5 years, and over $20 million since 2009.

158.     By way of comparison, the use of low-cost, institutional shares of an index fund would have included no revenue sharing costs, an expense ratio of less than 0.10%, and minimal transaction costs.

159.     This unavoidable loss from imprudent fund selection and retention is only compounded by the following examples of excessive and questionable fee payments to the Plan's CSPs.

160.     Captrust was first hired by the Plan in 2009 as an investment fiduciary, and according to Defendants' 2009 Form 5500, Captrust was paid $11,055 in its first year.

161.     According to subsequent Form 5500 filings, Captrust was again hired in 2014 to serve as a fiduciary and to assist Defendants in selecting and monitoring Trust investments (this is according to the Schedule C Service Code "27" contained on the Form 5500). However, Captrust's compensation had increased by a staggering $285,593 for a total pay of $296,648.

162.     Even assuming a 10% growth in pay year over year, the reasonable equivalent amount in 2014 would've only been $17,804, or 6% of what Captrust was actually paid that year.

| C Plan sponsor's name as shown on line 2a of Form 5500. | D Employer Identification Number (EIN) |
|---|---|
| AAA CAROLINAS | 56-0165100 |

| Part I | Information Concerning Insurance Contract Coverage, Fees, and Commissions Provide information for each contract on a separate Schedule A. Individual contracts grouped as a unit in Parts II and III can be reported on a single Schedule A. |
|---|---|

**1** Coverage Information:

**(a)** Name of insurance carrier

LINCOLN NATIONAL LIFE INSURANCE COMPANY

| (b) EIN | (c) NAIC code | (d) Contract or identification number | (e) Approximate number of persons covered at end of policy or contract year | Policy or contract year | |
|---|---|---|---|---|---|
| | | | | (f) From | (g) To |
| 35-0472300 | 65676 | 892334-087 | | 01/01/2009 | 12/31/2009 |

**2** Insurance fee and commission information. Enter the total fees and total commissions paid. List in item 3 the agents, brokers, and other persons in descending order of the amount paid.

| (a) Total amount of commissions paid | (b) Total amount of fees paid |
|---|---|
| 11055 | 0 |

**3** Persons receiving commissions and fees. (Complete as many entries as needed to report all persons.)

**(a)** Name and address of the agent, broker, or other person to whom commissions or fees were paid

CAPFINANCIAL PARTNERS, LLC

8816 SIX FORDS ROAD, SUITE 301
RALEIGH, NC 27615

CAPTRUST FINANCIAL ADVISORS

26-0058143

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. |
|---|---|---|
| 27 50 | NONE | 296648 |

163. The Fee Benchmarker 6th Edition (2017) is a product from industry corporation Fi360 that many financial institutions utilize to gauge the fees they are paying to their CSPs.

164. The grid below depicts typical values from the Benchmarker for similar services rendered, broken up by levels of experience.

33

## PROJECT FEE HOURLY RATES

|  | **Principal** | **Non-Principal Professional** |
|---|---|---|
| Mean | $306 per hour | $182 per hour |
| Median | $300 per hour | $163 per hour |
| Range | $125 to $500 per hour | $50 to $385 per hour |

165.     Assuming that Captrust's services provided comply with ERISA's "necessary for the operation of the plan" requirement, reasonable compensation can easily be calculated. Dividing the median Fee Benchmarker rates for principal/non-principal equally, multiplied by the typical labor required for their services, Captrust hourly would earn about $3,472.50 per quarter or $13,890 per year of services rendered. A twenty percent profit assumption for Captrust adds another $2,778 for an annual "reasonable compensation" amount under ERISA of $16,668.  That grossly contrasts with the nearly $300,000 that Captrust received.

166.     Excess compensation must be restored under the IRS' Restorative Payment process, and IRS Form 5500 instructs that applicable 15% and 100% excise taxes must be paid to the IRS. Rounding up to $20,000 for simplicity reveals that Captrust owes about $275,000 to the Plan and Trust in restorative payments for this overpayment, plus earnings since 2014.

167.     Plan officials certified for the years 2009 to 2019, under penalty of perjury, that there were no non-exempt transactions with a party-in-interest or no excessive payments to providers of Plan and Trust services. This certification is in direct contradiction of the data provided above. Payment of almost $300,000 to this CSP is over 10x more than is UCR (usual, customary, and reasonable) for the exact same services by similar providers, according to data from the Advisor Fee Benchmark database.

168.    Additionally, because Defendants chose to compensate their CSPs using asset-based revenue sharing, CSPs systematically received unjustified increases in pay.

169.    Asset-based compensation is a decision that is demonstrably not in the best interest of Plan participants, contrary to the provisions of ERISA. Simply put, asset-based compensation for services like recordkeeping disproportionately affects some investors over others, and greatly overcharges Plan participants as the Plan itself grows in value year after year.

170.    Asset-based pay can be excessive and is almost always imprudent under ERISA because recordkeepers' labor costs are tied to the number of records they have to keep, not the amount of assets within the records themselves. This labor cost is also declining over time due to advances in cloud technology and other software.

171.    As such, fiduciaries of plans similarly sized to Defendants typically require per capita or per record kept fees, ranging from $10 to $15 per quarter. Analogously, H&R Block charges taxpayers the same fee regardless of the amount of each taxpayer's income so long as they have the same federal tax form to complete and file.

172.    Big Four accounting firm Deloitte, in their 2019 Defined Contribution Benchmarking Survey Report, said that "[t]he average per-participant direct fee reported was $54, up from $50 in 2017, with the consistent trend of not utilizing investment revenue to pay fees."

173.    The danger of this asset-based compensation can be shown with a simple hypothetical. For example, if one participant has a balance of $1 million and another has a balance of $1000, and the recordkeeper is paid in the amount of 0.5% of assets, the participant with the $1 million balance will pay $5,000 per year, while the participant with $1000 will pay $5.

174.    Those costs would clearly not be consistent with the actual cost of the recordkeeping, as both participants get the same basic access to the plan website, annual statements, tax forms, etc.

In no way would it cost a thousand times more to keep records for a participant who simply has more zeros in their account.

175.    Similarly, as a plan grows, an asset-compensated recordkeeper would be paid more and more for the same work. It is more prudent to force recordkeepers to receive compensation on a per capita basis so that the recordkeeper is paid consistent with their actual cost and does not receive an inappropriate windfall.

176.    Specifically, the Plan grew by approximately 15% per year, meaning the Plan's recordkeeper was being paid essentially an extra 15% each year based on additional contributions being made into the Plan funds, when the actual cost of recordkeeping was not becoming anywhere near 15% more expensive per year. Compound this pattern across a suite of different investments, nearly 2,000 employees, and a decade of time and CSP pay grows quickly without providing any additional service to the Plan or participants, in violation of ERISA's necessary and reasonable requirement to avoid prohibited transactions.

177.    As alluded to briefly above, the Trust's (and therefore participants') mutual fund earnings from interest, dividends, and capital gains were reinvested into the same imprudent funds that were generating those gains, thereby kicking-back the excessive 12b-1 and service fees onto the original contributions from participants.

178.    This decision means that the net investment gains from the mutual funds' cost basis of $9,240,426 triggered another $46,202.13 in unnecessary, additional pay to Wells Fargo (recordkeeper), even before considering their earnings on the contribution basis. Reducing Trust investment gains in this way removed dollars that would have been compounded even more in the future had they not been sent to Wells Fargo (recordkeeper).

36

179.    Permitting overpayment of fees is not the end of fiduciary violations regarding CSPs. Section 404(a)(1) of ERISA established a fiduciary breach in failing to monitor these providers and to failing to engage in comparative shopping or solicitation and consideration of other bids with respect to any of a plan's CSPs.

180.    An example from the Plan is illustrative of this point. The Plan contained mutual funds from two different providers, John Hancock and JPMorgan. An important point missed by Defendants is the fact that they differed in how sub-T/A fees were paid – via the fund company's profits or via the trust/participants' accounts.

181.    According to the prospectus of the John Hancock funds, the parents company, John Hancock Investment Management LLC themselves, would bear the cost of the sub-accounting or sub-T/A fees paid to Wells Fargo (recordkeeper). Since the LLC did not pass this cost onto the fund's investors, these funds saved the Plan participants money, and Defendants knew or should have known this arrangement was very beneficial to Plan participants.

182.    The JPMorgan funds did the exact opposite. They passed the sub-accounting and sub-T/A fees onto the Plan participants. This arrangement benefits the parent company, J.P. Morgan Investment Management, Inc., to the detriment of Plan participants. Even though the language of the JPMorgan funds' prospectuses stated that they reserved the right to not charge their fund's investors, they did in fact charge Plan participants.

183.    Defendants should have read the prospectuses of the funds and recognized that this arrangement was actively harming their Plan participants. In other words, Defendants stood by and let their Trust's beneficiaries be harmed day after day for many years. By reading the prospectuses, Defendants would have or should have known that the JPMorgan funds were overcharging the Plan participants.

184.   The Plan contained a much larger percentage of its assets in the JPMorgan funds than in the John Hancock funds, exacerbating the loss of participants' hard-earned money. It may also serve as a discriminatory application of fees, in violation of both Defendants' plan document and ERISA.

185.   The plan document and ERISA both require that charges for services, benefits, rights, and features be "non-discriminatory." However, these sub-T/A fees could be charged as either dollars per investment owned or a percent of assets. Combine that with varying fees and 12b-1 costs and discrepancies appear. Since the above-mentioned JPMorgan and John Hancock funds varied widely in how their fees applied, Plan participants who either directed that all of their salary savings go into the JPMorgan fund or who made no direction and automatically had their savings put into the JPMorgan fund would in essence subsidize plan costs for other participants who had made different allocation decisions.

186.   Defendant allowed Wells Fargo (recordkeeper) to utilize their mutual fund selling agreements to get reimbursed regularly from revenue sharing credits, without review or requesting a proposal from the competition.

187.   The average account balance of Plan participants grew from $19,020 in 2014 to $34,299 in 2019. Since Wells Fargo's (recordkeeper) pay was asset-based, it nearly tripled from $70 per participant in 2014 to an astonishingly high $196 per participant in 2019.



188.    It is notable that in the same time period, the number of participants for whom Wells Fargo (recordkeeper) had to maintain records actually fell by 14%, from 2,101 to 1,812.

189.    While the Plan paid $196 per participant per year in 2019, the 401(k) Averages Book (a non-biased, comparative 401(k) cost information resource) determined that the average industry-wide was only $54 per year. This was echoed by Deloitte when it reported that "[t]he average per-participant direct fee … was $54 … with the consistent trend of not utilizing investment revenue to pay fees."

190.    In the first year of their enrollment, Plan participants would pay $128.69 annually to Wells Fargo (recordkeeper) for keeping their record. However, once they had been in the Plan for 5 years the same service, maintaining one record, would cost $270.13 due to increased basis of past savings, additional contributions over the years, and fund earnings being automatically reinvested daily into imprudent funds with excessive embedded revenue sharing costs.

Case 3:21-cv-00319-MOC-DCK    Document 7    Filed 08/18/21    Page 39 of 80



191. Defendants' use of 12b-1 fees, sub-T/A fees, and other forms of revenue sharing fees caused excessive payments to every CSP and party-in-interest over the 11 years from 2009-2019. These expenses were charged against the Trust's funds' net asset value (NAV) every single day for those 11 years. After the daily calculation of fund's NAV, these extra fees were "allocated" into the Plan participants' accounts each evening.

192. Each day that these dollars were taken, their lost earning potential continued to compound such that no amount of credit from Wells Fargo (recordkeeper) can properly restore their account balances.

193. Further evidence of Defendants' permitting inappropriate alienation of Trust assets can be seen when analyzing the Forms 5500 Schedules C.

194. Data from these forms shows direct payments to Captrust of almost $300,000 and to Wells Fargo (recordkeeper) and Lincoln Financial (previous recordkeeper) of $1,371,463. However, these payments have little mathematical or empirical relation to the records actually being kept.

195. For example, Lincoln's 50% increase in pay from 2009 to 2010 ($69,743 to $104,434) bears little relation to the 12% increase in records for them to keep (1,546 to 1,726).

40

196.     When Wells Fargo (recordkeeper) took over the job in 2011, they were only paid $42,572. This is typical for newly hired providers, who often underbid the incumbent to "win" the business. However, the next year in 2012, the records only increased by 7% (1,701 to 1,828) while their pay increased by 85% ($42,572 to $78,964).

197.     Even more egregious and confusing, in 2013 the number of records to keep actually fell by 9% (1,828 down to 1,664), at the same time that Wells Fargo's (recordkeeper) pay shot up by 108% ($78,964 to $163,943).

| YEAR | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TRUST $ TAKEN | 69,743 | 104,434 | 42,572 | 78,964 | 163,943 | 129,465 | 162,844 | 138,935 | 171,607 | 163,503 | 145,453 |
| LINE 6G #PARTS | 1,546 | 1,726 | 1,701 | 1,828 | 1,664 | 1,853 | 1,774 | 1,576 | 1,633 | 1,842 | 1,739 |

198.    One might believe that discrepancies and violations so blatant must have been sniffed out by the Plan's auditor, however this belief would be mistaken.

199.    Cherry Bekaert has been the independent auditor of the Plan since at least 2009. The official audit guide of the American Institute of Certified Public Accountants (AICPA) states that Cherry Bekaert must identify transactions and other Form 5500-based information that they believe is prohibited or inappropriate. If Cherry Bekaert had spent even a small amount of time auditing the financial and operations information of Defendants, they would have discovered, among other violations, potential CSP overpayment from the Trust to Captrust in 2014, varied direct Trust payments to Wells Fargo (recordkeeper), and extremely high administrative expenses relative to their other clients.

200.    In fact, Cherry Bekaert was only allowed by Defendants to perform limited scope audits from 2009 to 2019 and was never once allowed to complete a full scope independent audit of the Plan.

201.    Cherry Bekaert appears more than capable of performing an adequate, intelligent audit of an ERISA plan. Therefore, one can only think the reason this was not done was that either Cherry Bekaert employees were pressured by Plan officials to alter the records, or, that Cherry Bekaert was not given enough access and information to complete an accurate full analysis.

202.    This problem becomes even more evident when compared to the audit procedures ACG followed before acquiring the AAA Carolinas Plan. As of 1/1/2015, the AAA Carolinas Plan had assets of $39,069,638. ACG's existing plan had assets of $614,206,341, amounting to a trust that was 15x larger than the AAA Carolina Plan's. However, administrative expenses were higher for the AAA Carolinas Plan than for ACG's existing plan.

203. Total administrative expenses for ACG were only $109,824 while total administrative expenses for the AAA Carolinas Plan were $162,844, amounting to a plan with 15x fewer assets paying over $50,000 more in administrative costs. This disparity in cost was not due to the number of participants either. The ACG Plan had almost 9,000 participants with records kept at Vanguard, while Wells Fargo (recordkeeper) only had to maintain 1,774 records for the AAA Carolinas Plan.

204. The audit firm retained by ACG, George Johnson & Company, was allowed to complete a full scope independent audit, in contrast to the AAA Carolinas Plan.

205. In summary, ACG ran a much larger plan, at a much lower cost, and with better controls stemming, in part, from comprehensive audits performed by a qualified auditor. It follows that a full scope audit helps ensure that Plan costs are monitored, overpayments are avoided, and CSPs are properly monitored, all in compliance with ERISA's requirements

206. To the extent that ACG acquired a flawed plan from AAA, they nonetheless had a duty to correct their predecessors' mistakes. While ERISA does not permit fiduciary liability for breaches committed before or after an individual began serving as fiduciary, "this ban on vicarious liability for fiduciary breaches committed outside one's fiduciary tenure does not prevent a successor fiduciary from being held liable for his independent fiduciary breach in failing to remedy the continuing effect of a predecessor fiduciary's breach." *Fuller v. Suntrust Banks*, No. 1:11-CV-784-ODE, 2019 U.S. Dist. LEXIS 175913, at *19 (N.D. Ga. Jul. 15, 2019).

207. The discrepancies on AAA's side of this merger should have become very apparent after acquisition, especially since ACG and AAA are in similar lines of business, with similar missions, skills, and goals. This does nothing to discharge ACG of liability in this matter though.

208. In 2015, Wells Fargo (advisor) was hired to replace Captrust as investment advisor to the Plan. This role corresponds with Service Code 27 on Defendants' Form 5500 Schedule C.

WELLS FARGO BANK, N.A.

94-1347393

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. |
|---|---|---|
| 21 37 50 62 64 | SERVICE PROVIDER | 135081 |

(a

WELLS FARGO ADVISORS, LLC

34-1542819

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. |
|---|---|---|
| 27 51 | NONE | 27763 |

209.    Based on information and belief, Wells Fargo (advisor) was hired to replace Captrust in 2015, tasked with completing the exact same work that Captrust had been completing. However, Wells Fargo (advisor) charged less than one tenth (1/10) what Captrust had been charging. Captrust was paid $296,648 for 2014, while Wells Fargo (advisor) was only paid $27,763 in the following year, for the same Service Code 27 investment advisor duties.

210.    Both Defendants and these Service Code 27 fiduciary advisors oversaw the selection and retention of high cost actively managed funds and passive fund share classes when identical, cheaper, higher performing share classes were readily available. These imprudent actions by each party occurred consistently and persistently for all reporting years.

211.    Allowing these unnecessary provider costs to be charged directly to Trust assets damaged those assets and reduced their value for Plan participants year after year. Since they were paid directly from the Trust, they were allocated by Defendants as an expense under the plan document and its expense policy.

44

212.    Recall that every aspect of tax-exemption status under Internal Revenue Code (I.R.C.) § 401 (a) stems from the cost or benefit being reasonable, uniform, and non-discriminatory. The current Captrust to Wells Fargo (advisor) transition illustrates just one example of costs in violation of these three requirements.

213.    The Plan paid Wells Fargo (advisor) $27,763 in 2015, then increased this pay by almost 300% to $75,227 just one year later. They were then paid $63,422 in 2017 and a flat fee of $56,000 in both 2018 and 2019.

214.    Plaintiffs cannot solve the mystery as to how these direct Trust payments can vary so much year to year when fiduciaries like Captrust and Wells Fargo (advisor) are prohibited from "setting their own compensation." Any participation by these CSPs in determining their compensation would be a direct violation of 29 U.S.C. § 1106.

215.    To finish out discussion of this section, the Schedule C codes mentioned earlier need to be analyzed. Schedule C codes correspond to the various services that outside entities are hired to provide, like Code 32 for real estate brokerage and Code 12 for claims processing.

216.    Codes 26 and 27 both relate to investment advisor roles; however, Code 26 relates to fees charged for investment advice provided to Plan participants. Code 27 relates to advisory services delivered to the plan itself and not participants, although evaluating an entire plan's investment menu and performance is not dispositive as to whether Code 27 appropriately applies.

217.    Both Captrust and Wells Fargo (advisor) used Code 27 (investment advisory, plan) instead of the individual participant Code 26. The "benefit" under the Code 27 level was skewed in favor of the Plan instead of participants. This mistake was compounded by the fact that the Defendants directed these CSP costs to be levied on the Plan Trust, as opposed to on Defendants and the Plan sponsor. This is just one example of the many ways in which Defendants violated their duties of

45

loyalty and prudence by permitting overpayments to, and failing to monitor, CSPs and by maintaining imprudent, overly expensive investment options for the Plan.

**Defendants breached their duty to diversify Plan investment offerings pursuant to 29 U.S.C. § 1104 (a)(1)(C), which constitutes independent basis of liability, separate from the general duty of prudence.**

218.    29 U.S.C. § 1104 (a)(1)(C) requires fiduciaries to "diversify[ ] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so…."

219.    "Breach of the duty to diversify constitutes an independent basis of liability, separate from a breach of the general duty of prudence." *Liss v. Smith*, 991 F. Supp. 278, 301 (S.D.N.Y. 1998).

220.    In making a determination as to whether ERISA's diversification requirement was breached and whether defendants have met the burden of establishing that they acted with prudence, a court should consider: the purpose of the plan, the amount of plan assets, financial and industrial conditions, the type of investment, the distribution of investments as to geographic location, the distribution of investments as to industries, and the investments' dates of maturity. *Id*.

221.    Determinations as to whether ERISA's diversification requirement was breached require factual findings and are usually made on the basis of expert testimony after trial. *Id*.

222.    Stocks, mutual funds, and index funds are considered equity securities, as opposed to other financial instruments like bonds which is a form of debt security.

223.    Although equities provide the potential for higher upside than lower-risk investments like bonds, they also expose a plan to the potential for greater losses as well. Diversifying investments

46

is critically important to reduce risk and uncertainty because different asset classes generally do not increase or decrease in value at the same time.

224.    As such, "[u]nder the duty of diversification, the trustee should not normally invest all or an unduly large portion of plan funds in a single security, or in any one type of security, or even in various types of securities[,] that depend on the success of one enterprise." *Bruner v. Boatmen's Trust Co.*, 918 F. Supp. 1347, 1353 (E.D. Mo. 1996).

225.    Plaintiffs' experts have evaluated the diversification on the equity side of the Plan's investment choices selected, monitored, and retained by Defendants over three separate periods – the earliest possible, the start of the limitations period, and as current as possible. This was done using statistical analysis and correlation values.

226.    Correlation is an industry standard that measures how different securities move in tandem. A diversified portfolio should consist of securities that do not move in unison. Two securities that are perfectly correlated have a value of 1 (or 100%). Two securities that are perfectly inversely correlated have a value of -1 (or -100%). Two securities that have no correlation have a value of 0, aka low correlation.

227.    Defendants' certified filings between 2009 and 2019 reveal numerous problems with the diversification of the menu of available investment options.

228.    The JPMorgan target-date portfolios discussed in the previous section were conflicted, expensive, and poorly performing. Plan participants seeking alternatives to these funds, such as non-target date options, were also left with expensive and poorly performing options with which they were unable to build an adequately well-diversified portfolio.

229.    Of the 14 non-target-date investment options available to Plan participants, 12 of them were considered highly correlated equity funds. Having such a high proportion of the funds of this

47

type so tightly correlated means the participants would be forced to shoulder the burden of widespread stock market losses that typically occur every seven to ten years (ex. 1973-1974, 1981, 1990, 2001, 2009, and pandemic 2020).

230. According to the U.S. Bureau of Labor Statistics, the median employee tenure for men was 4.3 years in 2020, which has been unchanged since 2018. For women, the median employee tenure was 3.9 years, slightly down from 4.0 years in 2018.

231. Therefore, approximately one-quarter of Plan participants will leave each year, meaning retention of highly correlated assets and infrequent removal of imprudent funds is extremely harmful to those that leave these defendant organizations and cash out their accounts.

232. In reality, it is very simple to diversify a plan portfolio, particularly one the size of this Plan. Plaintiffs will provide a simple hypothetical to illustrate this point. A 401(k) plan could have three different funds and not be diversified at all. For example, those funds could be a Dow index fund, an S&P index fund, and an Aztec index fund. These funds certainly do not operate in complete lock step, and their correlation would be about 94%. However, sufficient diversification would not be achieved since all three of the funds are fundamentally tied to the equity value of large American companies.

233. By contrast, if a 401(k) plan had only two funds, an S&P 500 index fund and an Asian emerging market fund, the plan would be much more diversified. This is because the two funds would fundamentally be tied to the equity value of the American market and various Asian markets, which would not go up and down with the same synchronicity as three funds all tied to the same American equity market.

234. In this case, the funds that Defendants provided are too correlated with themselves, as is explained in more detail in a moment. A much more prudent, diversified approach by Defendants

48

would've been to retain some of the same domestic funds they had been, but also include emerging market funds, foreign small capitalization funds, and several other "creative" type investments that would've allowed employees to be invested in assets that were less correlated to the equity value of the U.S. market.

235. To research, consider, locate, and add emerging market funds, foreign small capitalization funds, etc. does require some work and vetting, and may result in lower commissions. However, these funds were nonetheless necessary for Plan participants to be able to diversify their portfolios adequately, especially in light of how important 401(k)'s are to the individual saving goals of families. Additionally, Wells Fargo (advisor) or any other 401(k) provider would have been able to provide these funds which are readily available in the marketplace.

236. Analytical analysis of the correlation of the funds that Defendants retained reveals just how lacking their portfolio was in terms of diversification. Plaintiff's experts created 3 correlation tables from the time periods described above.

237. In the earliest possible period analyzed, the asset correlation based on monthly returns was a staggering 91%.

| Asset Correlations: | 91% | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *Asset correlations for time period 05/01/2005 – 12/31/2009 based on monthly returns.* | | | | | | | | | | |
| Name | Ticker | PEO PX | RGA CX | PNE RX | PES PX | MGO AX | BGR FX | AAS SX | MID HX | TGV AX | RWI CX |
| BNY Mellon S&P 500 Index | PEO PX | - | 0.96 | 0.96 | 0.95 | 0.93 | 0.92 | 0.92 | 0.89 | 0.89 | 0.94 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| American Funds Growth Fund of Amer R3 | RGACX | 0.96 | - | 0.92 | 0.96 | 0.96 | 0.93 | 0.89 | 0.93 | 0.92 | 0.95 |
| Virtus NFJ Dividend Value R | PNERX | 0.96 | 0.92 | - | 0.92 | 0.9 | 0.88 | 0.92 | 0.88 | 0.89 | 0.93 |
| BNY Mellon MidCap Index Inv | PESPX | 0.95 | 0.96 | 0.92 | - | 0.97 | 0.97 | 0.97 | 0.88 | 0.85 | 0.9 |
| Victory Munder Mid-Cap Core Growth A | MGOAX | 0.93 | 0.96 | 0.9 | 0.97 | - | 0.94 | 0.91 | 0.89 | 0.88 | 0.91 |
| Baron Growth Retail | BGRFX | 0.92 | 0.93 | 0.88 | 0.97 | 0.94 | - | 0.94 | 0.84 | 0.82 | 0.86 |
| American Beacon Small Cp Val Adv | AASSX | 0.92 | 0.89 | 0.92 | 0.97 | 0.91 | 0.94 | - | 0.83 | 0.8 | 0.86 |
| MFS International New Discovery R3 | MIDHX | 0.89 | 0.93 | 0.88 | 0.88 | 0.89 | 0.84 | 0.83 | - | 0.96 | 0.97 |
| Thornburg International Equity Fund A | TGVAX | 0.89 | 0.92 | 0.89 | 0.85 | 0.88 | 0.82 | 0.8 | 0.96 | - | 0.97 |

Case 3:21-cv-00319-MOC-DCK   Document 7   Filed 08/18/21   Page 50 of 80

| American Funds Capital World Gr&Inc R3 | RWICX | 0.94 | 0.95 | 0.93 | 0.9 | 0.91 | 0.86 | 0.86 | 0.97 | 0.97 | - |
|---|---|---|---|---|---|---|---|---|---|---|---|

238. Looking at the second period, during which the default JPMorgan target-date funds were added, results in a similar correlation value of 89%.

**Asset Correlations — 89%**

*Asset correlations for time period 02/01/2012 - 12/31/2015 based on monthly returns.*

| Name | Ticker | MLAAX | JVLAX | PESPX | MGOAX | JMVSX | PGOAX | AASSX | RERCX | MINGX | MIDHX | JTTAX | JNSAX | JSMAX | SRJAX | SMTAX | JSAAX | JTSAX | JFFAX |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MainStay Winslow Large Cap Growth A | MLAAX | - | 0.87 | 0.85 | 0.87 | 0.84 | 0.8 | 0.76 | 0.82 | 0.8 | 0.8 | 0.88 | 0.89 | 0.9 | 0.91 | 0.92 | 0.92 | 0.92 | 0.91 |
| JHancock Disciplined Value A | JVLAX | 0.87 | - | 0.88 | 0.91 | 0.91 | 0.82 | 0.87 | 0.79 | 0.75 | 0.81 | 0.91 | 0.91 | 0.91 | 0.92 | 0.92 | 0.92 | 0.92 | 0.91 |
| BNY Mellon MidCap Index Inv | PESPX | 0.85 | 0.88 | - | 0.96 | 0.95 | 0.93 | 0.94 | 0.79 | 0.75 | 0.81 | 0.9 | 0.91 | 0.91 | 0.91 | 0.92 | 0.92 | 0.92 | 0.92 |
| Victory Munder Mid-Cap Core Growth A | MGOAX | 0.87 | 0.91 | 0.96 | - | 0.92 | 0.9 | 0.82 | 0.77 | 0.83 | 0.9 | 0.91 | 0.92 | 0.92 | 0.93 | 0.93 | 0.93 | 0.93 | 0.93 |
| JPMorgan Mid Cap Value I | JMVSX | 0.84 | 0.91 | 0.95 | 0.94 | - | 0.88 | 0.89 | 0.75 | 0.74 | 0.78 | 0.89 | 0.9 | 0.91 | 0.91 | 0.91 | 0.91 | 0.91 | 0.92 |
| PGIM Jennison Small Company A | PGOAX | 0.8 | 0.82 | 0.93 | 0.92 | 0.88 | - | 0.94 | 0.71 | 0.63 | 0.71 | 0.78 | 0.8 | 0.82 | 0.82 | 0.83 | 0.83 | 0.83 | 0.83 |
| American Beacon Small Cp Val Adv | AASSX | 0.76 | 0.87 | 0.94 | 0.9 | 0.89 | 0.94 | - | 0.69 | 0.62 | 0.74 | 0.79 | 0.82 | 0.83 | 0.83 | 0.84 | 0.84 | 0.84 | 0.84 |
| American Funds Europacific Growth R3 | RERCX | 0.82 | 0.79 | 0.79 | 0.82 | 0.75 | 0.71 | 0.69 | - | 0.92 | 0.94 | 0.93 | 0.93 | 0.93 | 0.93 | 0.93 | 0.93 | 0.93 | 0.93 |
| MFS International Intrinsic Value R3 | MINGX | 0.8 | 0.75 | 0.75 | 0.77 | 0.74 | 0.63 | 0.62 | 0.92 | - | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.89 | 0.89 | 0.89 |
| MFS International New Discovery R3 | MIDHX | 0.8 | 0.81 | 0.81 | 0.83 | 0.78 | 0.71 | 0.74 | 0.94 | 0.9 | - | 0.93 | 0.93 | 0.93 | 0.93 | 0.93 | 0.93 | 0.93 | 0.93 |
| JPMorgan SmartRetirement 2020 A | JTTAX | 0.88 | 0.87 | 0.9 | 0.9 | 0.89 | 0.78 | 0.79 | 0.93 | 0.9 | 0.93 | - | 1 | 0.99 | 0.99 | 0.99 | 0.99 | 0.99 | 0.99 |
| JPMorgan SmartRetirement 2025 A | JNSAX | 0.89 | 0.89 | 0.91 | 0.91 | 0.9 | 0.8 | 0.82 | 0.93 | 0.9 | 0.93 | 1 | - | 0.99 | 0.99 | 0.99 | 0.99 | 0.99 | 0.99 |
| JPMorgan SmartRetirement 2030 A | JSMAX | 0.9 | 0.91 | 0.91 | 0.92 | 0.9 | 0.82 | 0.83 | 0.93 | 0.9 | 0.93 | 0.99 | 0.99 | - | 1 | 1 | 1 | 1 | 1 |
| JPMorgan SmartRetirement 2035 A | SRJAX | 0.9 | 0.91 | 0.91 | 0.92 | 0.91 | 0.82 | 0.83 | 0.93 | 0.9 | 0.93 | 0.99 | 0.99 | 1 | - | 1 | 1 | 1 | 1 |
| JPMorgan SmartRetirement 2040 A | SMTAX | 0.91 | 0.92 | 0.92 | 0.93 | 0.91 | 0.83 | 0.84 | 0.93 | 0.9 | 0.93 | 0.99 | 0.99 | 1 | 1 | - | 1 | 1 | 1 |
| JPMorgan SmartRetirement 2045 A | JSAAX | 0.9 | 0.92 | 0.92 | 0.93 | 0.91 | 0.83 | 0.84 | 0.93 | 0.89 | 0.93 | 0.99 | 0.99 | 1 | 1 | 1 | - | 1 | 1 |
| JPMorgan SmartRetirement 2050 A | JTSAX | 0.91 | 0.92 | 0.92 | 0.93 | 0.91 | 0.83 | 0.84 | 0.93 | 0.89 | 0.93 | 0.99 | 0.99 | 1 | 1 | 1 | 1 | - | 1 |
| JPMorgan SmartRetirement 2055 A | JFFAX | 0.91 | 0.91 | 0.92 | 0.93 | 0.92 | 0.83 | 0.84 | 0.93 | 0.89 | 0.93 | 0.99 | 0.99 | 1 | 1 | 1 | 1 | 1 | - |

239. Finally, the most recent of the Defendants' filings from 2019 returns a similar result to the other two periods, with an 88% correlation value.

**Asset Correlations — 88%**

*Asset correlations for time period 04/01/2016 - 12/31/2019 based on monthly returns.*

| Name | Ticker | VIGAX | JVLAX | PESPX | PSMKX | JMVSX | TQAIX | AASSX | RERGX | MINGX | MIDHX | RRCTX | RFDTX | RFETX | RFFTX | RFGTX | RFHTX | RFITX | RFKTX | RFUTX |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vanguard Growth Index Admiral | VIGAX | - | 0.82 | 0.85 | 0.94 | 0.84 | 0.91 | 0.74 | 0.82 | 0.83 | 0.81 | 0.92 | 0.93 | 0.94 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 |
| JHancock Disciplined Value A | JVLAX | 0.82 | - | 0.92 | 0.82 | 0.94 | 0.87 | 0.9 | 0.71 | 0.62 | 0.62 | 0.84 | 0.86 | 0.87 | 0.88 | 0.88 | 0.88 | 0.88 | 0.88 | 0.88 |
| BNY Mellon MidCap Index Inv | PESPX | 0.85 | 0.92 | - | 0.9 | 0.97 | 0.96 | 0.96 | 0.7 | 0.67 | 0.65 | 0.83 | 0.85 | 0.86 | 0.88 | 0.88 | 0.88 | 0.88 | 0.88 | 0.88 |
| Pioneer Select Mid Cap Growth K | PSMKX | 0.94 | 0.82 | 0.9 | - | 0.87 | 0.96 | 0.8 | 0.74 | 0.75 | 0.74 | 0.86 | 0.87 | 0.88 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 |
| JPMorgan Mid Cap Value I | JMVSX | 0.84 | 0.94 | 0.97 | 0.87 | - | 0.91 | 0.92 | 0.72 | 0.69 | 0.66 | 0.85 | 0.86 | 0.87 | 0.88 | 0.89 | 0.89 | 0.89 | 0.89 | 0.89 |
| T. Rowe Price QM US Small-Cap Gr Eq I | TQAIX | 0.91 | 0.87 | 0.96 | 0.96 | 0.91 | - | 0.89 | 0.73 | 0.71 | 0.68 | 0.84 | 0.86 | 0.87 | 0.89 | 0.89 | 0.89 | 0.89 | 0.89 | 0.89 |
| American Beacon Small Cp Val Adv | AASSX | 0.74 | 0.9 | 0.96 | 0.8 | 0.92 | 0.89 | - | 0.61 | 0.63 | 0.55 | 0.7 | 0.73 | 0.75 | 0.77 | 0.78 | 0.78 | 0.78 | 0.79 | 0.78 |
| American Funds Europacific Growth R6 | RERGX | 0.82 | 0.71 | 0.7 | 0.74 | 0.72 | 0.71 | 0.61 | - | 0.88 | 0.94 | 0.9 | 0.92 | 0.92 | 0.92 | 0.92 | 0.92 | 0.92 | 0.92 | 0.92 |
| MFS International Intrinsic Value R3 | MINGX | 0.83 | 0.62 | 0.67 | 0.75 | 0.69 | 0.71 | 0.53 | 0.88 | - | 0.93 | 0.89 | 0.89 | 0.88 | 0.87 | 0.86 | 0.85 | 0.85 | 0.85 | 0.85 |
| MFS International New Discovery R3 | MIDHX | 0.81 | 0.62 | 0.65 | 0.74 | 0.66 | 0.68 | 0.55 | 0.94 | 0.93 | - | 0.86 | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 |
| American Funds 2020 Trgt Date Retire R6 | RRCTX | 0.92 | 0.82 | 0.83 | 0.86 | 0.85 | 0.84 | 0.7 | 0.9 | 0.89 | 0.86 | - | 1 | 0.99 | 0.98 | 0.98 | 0.98 | 0.98 | 0.98 | 0.98 |
| American Funds 2025 Trgt Date Retire R6 | RFDTX | 0.93 | 0.86 | 0.85 | 0.87 | 0.86 | 0.86 | 0.73 | 0.92 | 0.89 | 0.87 | 1 | - | 1 | 0.99 | 0.99 | 0.99 | 0.99 | 0.99 | 0.99 |
| American Funds 2030 Trgt Date Retire R6 | RFETX | 0.94 | 0.86 | 0.86 | 0.88 | 0.87 | 0.87 | 0.75 | 0.92 | 0.88 | 0.87 | 0.99 | 1 | - | 1 | 1 | 1 | 1 | 1 | 1 |
| American Funds 2035 Trgt Date Retire R6 | RFFTX | 0.95 | 0.87 | 0.88 | 0.9 | 0.88 | 0.89 | 0.77 | 0.92 | 0.87 | 0.87 | 0.98 | 0.99 | 1 | - | 1 | 1 | 1 | 1 | 1 |
| American Funds 2040 Trgt Date Retire R6 | RFGTX | 0.95 | 0.88 | 0.88 | 0.9 | 0.89 | 0.89 | 0.78 | 0.92 | 0.86 | 0.87 | 0.98 | 0.99 | 1 | 1 | - | 1 | 1 | 1 | 1 |
| American Funds 2045 Trgt Date Retire R6 | RFHTX | 0.95 | 0.88 | 0.88 | 0.9 | 0.89 | 0.89 | 0.78 | 0.92 | 0.86 | 0.87 | 0.98 | 0.99 | 1 | 1 | 1 | - | 1 | 1 | 1 |
| American Funds 2050 Trgt Date Retire R6 | RFITX | 0.95 | 0.88 | 0.88 | 0.9 | 0.89 | 0.89 | 0.78 | 0.92 | 0.86 | 0.87 | 0.98 | 0.99 | 1 | 1 | 1 | 1 | - | 1 | 1 |
| American Funds 2055 Trgt Date Retire R6 | RFKTX | 0.95 | 0.88 | 0.88 | 0.9 | 0.89 | 0.89 | 0.79 | 0.92 | 0.86 | 0.87 | 0.98 | 0.99 | 1 | 1 | 1 | 1 | 1 | - | 1 |
| American Funds 2060 Trgt Date Retire R6 | RFUTX | 0.95 | 0.88 | 0.88 | 0.9 | 0.89 | 0.89 | 0.78 | 0.92 | 0.86 | 0.87 | 0.98 | 0.99 | 1 | 1 | 1 | 1 | 1 | 1 | - |

240. In sum, modern portfolio theory and statistical analysis shows that the "efforts" to diversify the portfolio was, at best, ineffective. It left participants open to excess exposure risk in the normal course of the business cycle and world affairs. Diversification, particularly for a Plan as large as this one, is easily obtainable with prudent foresight. The fact that Defendants did not adequately diversify their Plan portfolio, in direct violation of ERISA, cost the Plan participants tremendous sums of money, to be revealed in discovery, that was easily avoidable.

**Defendants breached their duties of loyalty and prudence by permitting transactions considered "prohibited" under 29 U.S.C. § 1106.**

241. 29 U.S.C. § 1106 lays out a number of transactions that fiduciaries, parties in interest, and the Plan itself could engage in that are explicitly prohibited by virtue of ERISA.

242. The first set, § 1106 (a), include transactions whereby a fiduciary causes a plan to engage in a transaction when they know or should know that such a transaction constitutes a direct or indirect: sale, exchange, or leasing of property; lending of money or extension of credit; furnishing of goods, services, or facilities; or transfer or beneficial use of plan assets, between the plan and a party in interest.

243. The second set of prohibited transactions, § 1106 (b), include those where a fiduciary deals with the assets of the plan for their own interest or for their own account, acts in a transaction on behalf of a party with adverse interests to a plan, or receives any consideration for their own personal account from any party dealing with a covered plan.

244. Certain exemptions do exist under 29 U.S.C. § 1008 (b), such as when contracts are made between parties in interest and a plan for services rendered, but the services must be "necessary

for the establishment or operation of the plan" and so long as "no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108 (b)(2).

245.    "The prohibited transaction rules focus primarily on the relationship between the benefit plan and other parties to a transaction, and the section prohibits transactions where those dealing with the plan may have conflicting interests which could lead to self-dealing." *Leigh v. Engle*, 727 F.2d 113, 123 (7th Cir. 1984).

246.    The Supreme Court has spoken about how these transactions rules "supplement[] the fiduciary's general duty of loyalty to the plan's beneficiaries … by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 241-42 (2000).

247.    "The transactions enumerated in [29 U.S.C. § 1106] are per se violations of ERISA regardless of the motivations which initiated the transaction, the prudence of the transaction, or the absence of any harm resulting from the transaction." *Iron Workers Local No. 60 Annuity Pension Fund v. Solvay Iron Works, Inc.,* 2018 U.S. Dist. LEXIS 79735, at *33 (N.D.N.Y. May 11, 2018) (quoting *Liss v. Smith*, 991 F. Supp. 278, 307 n.30 (S.D.N.Y. 1998)).

248.    Engaging in prohibited transactions that are rife with conflicts of interest can open a fiduciary to both personal liability under 29 U.S.C. § 1109 and stiff tax penalties under parallel IRS Code provisions in 26 U.S.C. § 4975.

249.    For over a decade, the Plan's fiduciaries have certified to the U.S. Department of Labor and the U.S. Treasury that no prohibited transactions have occurred, evidenced by responses to Form 5500 Schedule H.

| | | | Yes | No |
|---|---|---|---|---|
| c | Were any leases to which the plan was a party in default or classified during the year as uncollectible? (Attach Schedule G (Form 5500) Part II if "Yes" is checked.) ..................................... | **4c** | | X |
| d | Were there any nonexempt transactions with any party-in-interest? (Do not include transactions reported on line 4a. Attach Schedule G (Form 5500) Part III if "Yes" is checked.)................................................................................................................ | **4d** | | X |

250.  They also never filed Forms 5330 with the IRS, which are used to report and pay excise taxes related to employee benefit plans.

251.  Fiduciaries who uncover compliance breaches that were unintended, regardless of if the plan's year is closed or not, can correct them through programs from the Labor Department and the Treasury in order to maintain tax-exemptions.

252.  Instead of utilizing these programs, Plan officials certified under penalty of perjury for the eleven plan years from 2009 to 2019 that there were no non-exempt transactions with a party in interest, or no excessive payments to providers of Plan and Trust services.

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete.

| SIGN HERE | Filed with authorized/valid electronic signature. | 10/14/2020 | CARMEN MABE |
|---|---|---|---|
| | Signature of plan administrator | Date | Enter name of individual signing as plan administrator |
| SIGN HERE | Filed with authorized/valid electronic signature. | 10/14/2020 | CARMEN MABE |
| | Signature of employer/plan sponsor | Date | Enter name of individual signing as employer or plan sponsor |

253.  These certifications were made even when the Trust paid almost $300,000 to Captrust in 2014 under Service Code 27. Advisor Fee Benchmark data reveals that this payment is over 10x more than is usual, customary, and reasonable for identical services by similar providers.

254.  The list of services for which Captrust was paid almost $300,000 include the following basic services: investment advisory consulting, plan level advice, and ongoing investment due diligence.

54

255. While discharging these listed services, Captrust instructed or aided Defendants in adding the high-cost JPMorgan A share class funds that made up half of the Plan, paying a 1% finder's fee (potentially back to Captrust), and instructing Plan participants to move their asset to "seed" these kick-back generating high cost-low performance share classes.

256. Captrust was at the very least conflicted in offering any services to the Plan surrounding these funds, since they stood to receive at least some of the money from the kickbacks, the cost of which was being borne by Plan participants.

257. Captrust's services rendered were highly detrimental to the Plan and its participants, failing to qualify as an exempt transaction under 29 U.S.C. § 1008 (b)(2) as necessary for the operation of the Plan and reasonable in cost, so any compensation for such services creates a prohibited transaction.

258. This is only the first example of a litany of prohibited transactions entered into by Defendants.

259. The funds chosen by Defendants, with their high 12b-1 and other service fees, alienate and reduce the net asset value (NAV) of Plan assets every day of the year, without requiring CSPs to provide commensurate additional services, creating prohibited transactions.

260. The Trust's earnings from mutual funds were automatically reinvested into the same imprudent and excessively costly funds generating them, kicking back the same excessive fees onto the original contributions. This loop means that gains of $9,240,426 triggered additional pay to Wells Fargo (recordkeeper) in the amount of $46,202.12. Paying these fees from the funds of the Trust instead of on a "reasonable profit margin" or per capita/per record fees creates a prohibited transaction.

261.    Reduction of Trust assets in this way was especially egregious because it removed dollars that would've achieved compound growth into the future had they not been taken away and inappropriately paid to Wells Fargo (recordkeeper).

262.    Kickbacks are also apparent in the case of the JPMorgan Smart Retirement target date 2030 funds that were analyzed by Defendants in 2014.  The first $4 million seeded into this series kicked back 1%, or $40,000, to a party in interest. The party in interest who receives this "finders" money normally requires a FINRA affiliation, meaning the recipient was either Wells Fargo (recordkeeper) or Captrust.

263.    These finder's fee kickbacks are also called soft dollars or pay to play indirect dollars and are considered compensation under 29 U.S.C. § 1108 (b)(2), as are direct trust payments. This inappropriate compensation kickback to a party in interest constitutes a prohibited transaction.

264.    Utilizing FundAnalyzer, the Defendants would've seen alternative JPMorgan SmartRetirement class C and I funds, which are cheaper and do not contain these prohibited kickback fees. The Plan could've very easily obtained these in-compliance funds due to its size, yet Defendants and parties in interest chose not to in order to grant themselves a windfall every year.

265.    Violations also appear relating to what has been termed the multiple services issue, which is "a prohibition, suggested by ERISA's structure and legislative history, against providing 'multiple services' to a plan." *Sellers v. Anthem Life Ins. Co.,* 316 F. Supp. 3d 25, 39 (D.C. Cir. 2018).

266.    "[29 U.S.C. § 1108 (b)(6)] suggests that, while fiduciary banks can provide one service to a plan, they cannot provide additional, ancillary services to that plan…." Id. This is also evidenced by the legislative history of the statute, suggesting that, for example, a brokerage house would be

prohibited from providing both discretionary investment management and brokerage services to the same plan. Id.

267.    "[W]hat matters is whether the service provider, at the time it is furnishing that service, has a separate relationship with the plan that makes it a party in interest … such a separate relationship would exist if the service provider were simultaneously furnishing a different service of a fiduciary nature." Id.

268.    For example, in the absence of a separate exemption, Wells Fargo Bank would engage in a separate act of self-dealing if it caused a plan to retain Wells Fargo (advisor) for any additional compensation, no matter how reasonable.

269.    In light of this, the hiring of Wells Fargo (advisor) to replace Captrust in 2014 seems to confirm two violations. First, it is a blatant violation of the multiple services issue, since the Plan utilized the services of the Wells Fargo Bank while also retaining their investment advisory division for additional pay. Second, this hiring of a much cheaper investment advisor all but confirms that Defendants knew that the astronomical pay granted to Captrust the year before was a prohibited transaction, alienating Plan participants' accounts and the Trust's assets inappropriately.

270.    However, Defendants never filed for voluntary correction under the correction programs of either the Department of Labor or the IRS. They also have not paid their related federal excise taxes to either of those entities. Finally, Defendants should have sent the Treasury and Labor Department a Form 5500 Schedule G (Financial Transaction Schedule), which would have led the government to contact Captrust as well. Because these things were not done, and based on Plaintiffs' experts searches at www.efast.dol.gov, the IRS' tier 2 level of 100% excise taxes applies to both Defendants and related party in interest Captrust.

271. As was established previously, an "appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2nd Cir. 1985). Defendants' actions confirm that the Trust itself is owed this excess direct payment, and any associated lost earnings, from both Defendants and Captrust.

272. In sum, the Defendants in this matter engaged in a series of transactions with parties in interest that are not permitted to happen under ERISA's prohibited transaction provisions. These transactions harmed the Plan and its participants, and corrective action should be taken to remedy these per se violations of ERISA.

**Defendants breached their duties of loyalty and prudence by failing to follow the provisions of the governing plan documents and instruments as required by 29 U.S.C. § 1104 (a)(1)(D).**

273. ERISA requires that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument. Such instrument shall provide for one or more fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

274. In fact, ERISA's entire statutory scheme "is built around reliance on the face of written plan documents." *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300-301 (2009) (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995)).

275. Fiduciaries are also mandated to discharge their duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the [other] provisions" of ERISA. 29 U.S.C. § 1104(a)(1)(D).

276.     However, the Supreme Court established that "the duty of prudence trumps the instructions of a plan document[.]" *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014).

277.     A plan may also be disqualified from favorable tax treatment for operational failures, which occur if a plan fails to operate in accordance with statutory requirements, or if it fails to follow the terms of the plan document. 26 U.S.C. §§ 401 (a), 501(a).

278.     Plaintiffs do not currently have access to the internal governing plan documents but given Wells Fargo Bank's extensive roles in the Plan, it is reasonable to assume that the Plan is structured consistent with the Basic Plan Document #01 of the Wells Fargo Defined Contribution Prototype Plan and Trust Agreement ("Plan document"). The document is a publicly available prototype plan document published by Wells Fargo that is "intended to conform to and qualify under §401 and §501" of the Internal Revenue Code for tax-exemption status, as was Defendants' Plan.

279.     Proceeding under the assumption that the prototype document provided by the Plan's advisor and recordkeeper is reflective of the actual governing plan documents, the following violations appear to have occurred.

280.     Defendants violated provisions of the plan documents by failing to take corrective action after the harms of their previously imprudent investment and management decisions came to light.

281.     Section 7.08 of the Plan document states that the plan administrator, in conjunction with the employer and trustee, may undertake such correction of plan failures as the plan administrator deems necessary. These corrections include following the procedures of either the IRS' Employee Plans Compliance Resolution System (EPCRS) or the Labor Department's Voluntary Fiduciary Correction Program (VFCP).

282.     The section states that these actions include corrections to preserve tax status, corrections to breach fiduciary violations, and corrections to "unwind" a prohibited transaction under ERISA.

283.     The Plan document provides the plan administrator with wide discretion in taking action to remedy duty breaches and other violations so that Plan participants' harm is limited as much as possible.

284.     Adhering to the document and correcting the breaches once they were exposed would have helped at least slow the loss of Plan participants' assets, or possibly even began the critical "alternative remedy of restoring plan participants to the position in which they would have occupied but for the breach of trust." *Eaves v. Penn*, 587 F.2d 453, 462 (10th Cir. 1978).

285.     However, Defendants did the exact opposite. Upon receiving knowledge or indications that both their investment decisions and transaction history were likely in violation of ERISA, they failed to undertake any of the options provided to them under this Plan document, or under the two external corrective programs that it points fiduciaries to (VFCP or EPCRS).

286.     Defendants further violated the provisions of the Plan document by failing to allocate plan expenses in a reasonable, uniform, and nondiscriminatory manner.

287.     "The Supreme Court has stated that a plan administrator has a 'statutory responsibility [under ERISA] … to run the plan in accordance with the currently operative, governing plan documents.'" *Hunt v. Hawthorne Assocs.,* 119 F.3d 888, 909 (11th Cir. 1997) (quoting *Curtiss-Wright*, 514 U.S. 73, 115 (1995)).

288.     While these plan documents sometimes give administrators freedoms in the discharge of their duties, "ERISA specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents…." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996).

289.     The applicable section of the Plan document is section 7.04(C)(2) – "Allocation of Plan expense." This section states that the plan administrator has discretion as to how to allocate plan expenses, which expenses will be allocated to individual accounts, and to draft and adopt an

expense policy in accordance with these decisions. However, the Plan document also says that this discretion must be wielded in a "reasonable, uniform, and nondiscriminatory manner."

290. The allocation of expenses in the Plan was anything but reasonable, uniform, and nondiscriminatory. Defendants chose to pay many of their costs out of Trust and participant funds directly, and the very nature of paying CSPs and parties in interest using funds from participant directed defined contributions is fraught with risk because everything hinges on the funds chosen by the individual participants. As demonstrated previously, the funds chosen by Defendants had totally arbitrary and ever-changing mixtures of 12b-1 fees, finder's fees, soft-dollar compensation, shareholder service fees, and sub-T/A fees (some of which were dollars per investment owned and others were percentage of assets).

291. In practice, this means that participants who chose to invest in the riskier, imprudent funds with unnecessary and unreasonably high fees bore more of the brunt of the plan expenses than did a participant who picked the lesser of the imprudent funds from Defendants' investment menu.

292. This method of Plan expense allocation results in inconsistent and unreasonable payments from different participants, discriminating against some based on their investment choices. This can hardly be the outcome expected under section 7.04(C)(2) of the Plan document.

293. As an important side note, the split in categories of Plan participants in the context of discriminatory and non-uniform expense allocation has no effect on the typicality component of class certification.

294. "In ERISA breach of fiduciary duty cases … courts sometimes break the typicality requirement into three elements." *Beach v. JPMorgan Chase Bank, N.A.,* 2019 U.S. Dist. LEXIS 97946 at *23-24 (S.D.N.Y. Jun. 11, 2019). The first element is claims largely arising from the same course of events, usually the parties' participation in the Plan. *Id.* The second element is

plaintiffs making similar legal arguments about mismanagement to prove liability, and the "third element is, effectively, that each plaintiff invested in at least one of the subject funds." *Id.*

295.    "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying the individual claims." *Robidoux v. Celani,* 987 F.2d 931, 936-37 (2nd Cir. 1993).

296.    Defendants further violated their duties through their failure to adopt or follow an investment policy, as required by the Plan document and ERISA.

297.    Section 7.02(C)(9) of the Plan document states that the plan administrator must periodically communicate to the plan trustee and investment managers the plans short- and long-term financial needs to help in coordinating the plans investment policy.

298.    Additionally, section 8.02(C)(2) of the Plan document states that the Plan trustee or custodian has a duty to coordinate an investment policy using the financial needs defined by the plan administrator.

299.    The resulting investment policy is a document that is critically important to maintaining a prudent and beneficial plan for participants. "Fiduciaries who are responsible for plan investments … must comply with the plan's written statements of investment policy[.]" *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.,* 259 F.3d 1036, 1042 (9th Cir. 2001).

300.    This investment policy has some bearing on fiduciary duty breach analysis by courts, who are instructed to "inquire 'whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'" *Wright v. Or. Metallurgical Corp.,* 360 F.3d 1090, 1097 (9th Cir. 2004) (quoting *Donovan v. Mazzola,* 716 F.2d 1226, 1232 (9th Cir. 1983)).

301. In this case, it appears that Defendants failed to follow the methods and statements of their written investment policy. Upon Plaintiffs experts' information and belief, Defendants may not have drafted an investment policy for the Plan at all.

302. Plan officials must investigate all proposed investments of plan assets with regard to risk and return, as well as their appropriateness in light of the composition and aims of the funds' portfolio.

303. Defendants' actions do not indicate they undertook analysis of this sort. Maintaining imprudently expensive funds with high 12b-1 and other revenue sharing and service fees, as well as choosing funds that were considered non-diversified in light of the existing composition of the portfolio, can hardly be seen as the results of a full-scale risk/reward analysis under defined investment goals laid out by Plan administrators in an investment policy.

304. Having no central investment policy written out, or at least failing to adhere to it, allowed the imprudent investment decisions detailed in this complaint to occur for a decade.

305. Complying with a well-defined investment policy, as required by ERISA and the Plan document, would have led to much more prudent investment decisions being made by those in charge of the Plan.

306. "In determining compliance with ERISA's prudent man standard, courts objectively assess whether the fiduciary, at the time of the transaction, utilized proper methods to investigate, evaluate, and structure the investment[.]" *Laborers Nat'l Pension Fund v. Northern Trust Quantitative Advisors, Inc.,* 173 F.3d 313, 317 (5th Cir. 1999).

307. Prudent action simply cannot be found when the Plan contained harmful, costly, and undiversified funds that would have likely been excluded had "proper methods to investigate,

evaluate, and structure the investment" been used by Defendants. Since this did not occur, a breach of fiduciary duties caused by failure to follow plan documents must be found.

## CLASS ACTION ALLEGATIONS

308. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the class of persons described herein and on behalf of the Plan. Plaintiffs reserve the right to revise their class definitions and to propose other or additional classes in subsequent pleadings or their motion for class certification, after discovery in this action.

309. Plaintiffs Wes Johnson and Tamekia Bottoms assert the Counts against Defendants on behalf of the Plan and in acting in this representative capacity to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.

310. Numerosity: The Classes are so numerous that joinder of all Class members is impracticable. The Plan had between 1,700 and 2,100 participants and beneficiaries at the start of the applicable statutory period.

311. Typicality: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are current or former participants in the Plan, who have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other class members with regard to the Plan. Defendants managed the Plan as a single-employer defined contribution plan, in an omnibus account, and therefore Defendants' imprudent decisions

affected all Plan participants similarly. Plan participants are trust beneficiaries of the same Trust and use the same custodian and recordkeeping system.

312.    Plan documentation states that "the Plan is a defined contribution plan covering all employees of Carolina Motor Club, Inc. and Subsidiaries (the "Plan Sponsor" or "Employer") with the exception of temporary and seasonal employees. Member Service Center employees are excluded from the discretionary profit-sharing contribution. The Plan is subject to the provisions of Employee Retirement Income Security Act of 1974 ("ERISA"). Employees can become eligible to participate in the Plan on the first day of each month (the "entry date"). Employees are eligible to participate in the Plan on the first entry date following the employment commencement date."

313.    The mutual funds and other securities at issue are not registered to or owned by Plan participants, like in an individual retirement account (IRA). Instead, the Plan's Trust owns the SEC-registered securities and the Trust buys and sells them at an omnibus or net aggregate trust level and settles the shares every evening with the recordkeeper (who updates an accounting record for each Plan participant every evening called a daily valuation).

314.    Therefore, each Plan participant or Class member is simply a member of the Trust or a beneficiary trading via a common trust and a common recordkeeping firm to maintain their accounts. Plaintiff's claims are typical of the claims of the Class. They have no interests that are antagonistic to the claims of the Class. Questions of law and fact are common to the members of the Class and predominate over individual questions. Plaintiffs understand that this matter cannot be settled without the Court's approval.

315.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Classes, as their interests are aligned with the Class' interest in that they seek to represent and have retained counsel experienced in class action litigation and possess good knowledge of ERISA. Plaintiffs do not have

any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

316. Fitzgerald Litigation, P.C. ("Fitzgerald Litigation") agrees to advance the costs of this action contingent upon the outcome, and it is aware that no fee can be awarded without the Court's approval.

317. Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

A. Whether Defendants breached their duties of prudence and loyalty by maintaining a plan with excessively expensive funds when superior alternatives existed;

B. Whether Defendants breached their duties of prudence and loyalty by failing to remove imprudent investments;

C. Whether Defendants breached their duties of prudence and loyalty by failing to properly monitor CSPs, allowing them to overcharge the Plan with fees;

D. Whether Defendants breached their duty to diversify Plan offerings, a separate basis of liability under 29 U.S.C. § 1104 (a)(1)(C);

E. Whether Defendants breached their duties of loyalty and prudence by permitting prohibited transactions to occur under 29 U.S.C. § 1106;

F. Whether the indirect compensation and/or revenue sharing payments received by Defendants, or any CSP, exceeded reasonable compensation for the services provided, thus constituting a prohibited transaction with a fiduciary and party-in-interest under 29 U.S.C. §1106, or whether expenses paid by Plan participants exceeded that which was reasonable and thus constituted the same under 29 U.S.C. § 1106;

66

G. Whether Defendants breached their duties of loyalty and prudence by failing to follow the provisions of the Plan document;

H. Whether Defendants failed to exercise appropriate skill, care, loyalty, and diligence by failing to investigate lower cost funds or attempt to negotiate lower fees;

I. Whether Defendants breached their duty to properly select Plan investments and remove imprudent investments;

J. The proper measure of monetary relief; and

K. The proper form of equitable and injunctive relief.

318. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class. Separate lawsuits would establish incompatible standards to govern Defendants' conduct as fiduciaries.

319. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual class members, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award or equitable relief by the Court such as removal of particular Plan investments or removal of a Plan fiduciary would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

320. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual

Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct described in this Complaint applied uniformly to all members of the Classes.

321.    Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class members individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis.

322.    Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices.

323.    Moreover, management of this action as a class action will not present any likely difficulties.

324.    In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I

### BREACH OF DUTIES OF LOYALTY AND PRUDENCE, 29 U.S.C. § 1104(a)(1)(A)-(B), BY MAINTAINING AND FAILING TO REMOVE EXPENSIVE IMPRUDENT FUNDS AND BY FAILING TO MONITOR CSP'S RESULTING IN OVERCOMPENSATION.

325.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

326.    29 U.S.C. § 1104 imposes the fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

327.    During the Class period, the Defendants were named fiduciaries pursuant to 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A), or both.

328.    Defendants breached their duties of loyalty and prudence by:

68

A. Providing expensive retail share classes rather than institutional share classes;

B. Maintaining share classes with excessive, costly fees and failing to remove them once this was uncovered;

C. Allowing CSPs to charge excessive fees to participants and the Plan;

D. Not negotiating with CSPs to lower costs; and

E. The breaches and issues described more fully in the motion above for class certification.

329. Based on Forms 5500 from the years at issue, most, if not all, of the Plan's investments failed because the Defendants' investment decision methods and procedures were flawed.

330. As described throughout the Complaint, Defendants breached their fiduciary duties of prudence and loyalty related to administration of the Plan by failing to take reasonable steps to manage administrative costs and fees, including selecting only funds that charged those fees onto Plan participants and not on Defendants.

331. Since changing their investment advisor from Captrust to Wells Fargo (advisor), Defendants have not engaged in an objective, competitive process to hire the lowest cost provider for these services. Instead, they have been changing the compensation paid to these companies by hundreds of percent year over year in no discernable pattern and for no discernable reason.

332. The compensation to Wells Fargo (recordkeeper) has been arbitrarily rising year after year in the same way, constituting another breach on Defendants' part.

333. Much of this high compensation was asset-based and came from heavy fees levied on the Plan participants assets and the assets of the Plan/Trust itself. Choosing almost exclusively funds with fee structures similar to this is an imprudent decision negatively affecting the Plan participants, for which they should be compensated.

69

334.    Defendants also failed to take prudent steps to monitor and control administrative costs on an ongoing basis, such as hiring a consultant to conduct a benchmarking study, submitting an RFP (or RFI) to other service providers to solicit information and competitive bids, and hiring those CSP's with the most competitive pricing and services.

335.    According to Labor Department rules, their failure to adequately monitor the performance and cost of all CSPs constitutes a neglect of their responsibilities as a fiduciary and violates the fiduciary responsibility and prudence standards required by ERISA.

336.    Defendants breached their fiduciary duties of prudence and loyalty with respect to selection and management of the Plan's investment options by, inter alia:

A.  Failing to act "solely and exclusively" for the benefit of participants by selecting and retaining investments in the Plan NOT because they merited inclusion after a thorough investigation, but because they would generate more revenue for the CSPs, and therefore Defendants would not receive an invoice (or a significantly reduced one) for these services;

B.  Selecting and maintaining mutual funds in the Plan based upon their willingness to pay revenue sharing and/or indirect compensation rather than selecting identical lower-cost versions that may not have been willing to pay revenue sharing, but would increase compounded growth of participants' accounts;

C.  Negotiating large revenue sharing payments in lieu of attempting to negotiate lower investment management expenses or refunding larger portions of investment management expenses to Plan participants;

D.  Failing to monitor Plan investments and explore whether the mutual fund investment management services could be provided at lower cost, despite the fact that lower cost

70

funds' assets were orders of magnitude larger (meaning they were NOT choosing the institutional versions used predominately by most pensions and larger 401(k) plans);

E.  Failing to conduct a prudent and objective review of the Plan's investments and failing to remove the imprudent, costly, and underperforming funds;

F.  Allowing earnings from mutual funds to be automatically reinvested in the same imprudent funds that generated them, diluting Plan participants current and future growth potential; and

G.  Failing to conduct a prudent and objective review of the Plan's investments' correlations to one another and protect investors from account losses.

337.    The Supreme Court held that this [monitoring] duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset … the trustee must 'systematic[ally] conside[r] all the investments of the trust at regular intervals' to assure that they are appropriate.

338.    According to Plan documents, the Plan administrator determines which expenses will be charged to the Plan as a whole and which will be charged against individual accounts, and to manage and control the operations and administration of the Plan, which may be designated out to other individuals or organizations. Once Plaintiffs obtain the Plan's Adoption Agreement, meeting minutes, etc., a more formal and precise list of Defendants and breaches can be asserted. As described throughout the Complaint, Defendants breached their fiduciary duties of prudence and loyalty related to administration of the Plan by failing to take reasonable steps to manage administrative costs of the Plan.

71

339. Defendants hired CSPs like Captrust and Wells Fargo Bank to further the Defendants' profits without engaging in an objective, competitive process to hire unconflicted and reasonably compensated providers that were necessary for the operation of the Plan.

340. Each Defendant performing non-investment-related duties also knowingly participated in the breaches of the other Defendants performing such duties, knowing that other Defendants were breaching their fiduciary duties, and enabling commission of the breaches by failing to lawfully discharge their own fiduciary duties or make any reasonable effort under the circumstances to remedy the other Defendants' breaches.

341. Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

342. On behalf of the Plan, Plaintiffs also seek appropriate equitable relief pursuant to 29 U.S.C § 1132(a)(3) (as described in the Prayer for Relief), recovery of pre-judgment interest, *see Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1030-31 (4th Cir. 1993); *Meyer v. Berkshire Life Ins. Co.,* 250 F. Supp. 2d 544, 574 (D. Md. 2003), and attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

## COUNT II

## BREACH OF DUTY TO DIVERSIFY THE INVESTMENTS OF THE PLAN UNDER 29 U.S.C. § 1104(a)(1)(C).

343. Plaintiffs reallege and incorporate by reference the proceeding paragraphs as if set forth herein.

72

344.   Defendants were fiduciaries, as discussed above, for the Plan and their participants, including Plaintiffs and the proposed Class.

345.   A fiduciary must comply with the duty of prudence, which includes, *inter alia*, the duty to diversify and to monitor and remove improper investments. In carrying out these duties, fiduciaries must comply with the care, skill, prudence, and diligence of a prudent person under the circumstances then prevailing.

346.   The U.S. Department of Labor and case law have interpreted this duty. In order to comply with the duty of prudence, a fiduciary must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(1).

347.   Appropriate consideration, according to Department of Labor regulations, includes but is not necessarily limited to: "(i) [a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or whether applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and (ii) [c]onsideration of the following factors …:

    A.   [t]he composition of the portfolio with regard to diversification,

    B.   [t]he liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

C. [t]he projected return of the portfolio relative to the funding objectives of the plan." 29 C.F.R. § 2550.404a-1(b)(2).

348.   Defendants' conduct with respect to the Plan violated in numerous ways their fiduciary duties of prudence and diversification as alleged above.

349.   Defendants lacked, for example, a basic overseas emerging market fund that would have greatly helped participants diversify.

350.   Defendants also maintained a portfolio with asset correlation values in the high 80 and low 90 precents, meaning the contents of the portfolio were too similar to have sufficient diversification.

351.   This Count focuses primarily on the diversification deficiencies described above. The Plan is not construed in a way to allow participants to diversify their investments, and this they are unable to maintain a good portfolio.

352.   Defendants' actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class. As a result of this wrongdoing, Defendants are liable for all resulting loss and damage.

## COUNT III

### ENGAGING IN PROHIBITED TRANSACTIONS WITH A PARTY-IN-INTEREST IN VIOLATION OF 29 U.S.C. § 1106(a)(1).

353.   Plaintiffs reallege and incorporate by reference the proceeding paragraphs as if set forth fully herein.

354.   Captrust and Wells Fargo Bank are parties in interest to the Plan and the Defendants are fiduciaries. Defendants paid Captrust and Wells Fargo Bank excess compensation that must be

restored to the Plan participants. Wells Fargo Bank may have also been involved in self-dealing transactions in violation of the applicable ERISA section as well.

355. The factual findings of how Captrust and Wells Fargo Bank were excessively paid was discussed above in the Complaint. This relationship between the Plan and these two parties resulted in the parties being paid via excessive 12b-1, sub-T/A, and recordkeeping fees.

356. Captrust and Wells Fargo Bank's excessive payment was a result of the Defendants' and Plan fiduciaries prohibited transactions and breaches of fiduciary duties.

357. As described throughout the Complaint, and in violation of 29 U.S.C. § 1108(b)(2), Defendants caused the Plan to use conflicted providers and investments that not only were not "necessary for operation of the Plan", but for who excessive compensation constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation and a transfer of assets of the Plan to a party in interest.

358. As described throughout the Complaint, Defendants caused the Plan to incur revenue sharing costs knowing that the payments greatly exceeded the value of services provided to the Plan and therefore constituted a prohibited transaction under 29 U.S.C. § 1106(a)(1).

359. As described throughout the Complaint, Defendants knew or should have known these parties in interest would receive excessive compensation for these services directly or indirectly from Plan assets which constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation and a transfer of assets of the Plan to a party in interest.

360. As a direct and proximate result of these prohibited transactions, the plan directly or indirectly paid millions of dollars in administrative and investment management and other fees to

parties in interest in transactions that were prohibited under ERISA, thereby suffering millions of dollars in losses.

361.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received and/or earned resulting directly or indirectly from the above-mentioned prohibited transactions. Plaintiffs also seek appropriate equitable relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(3).

362.    "The transactions covered by [29 U.S.C. § 1106(a)(1)] 'are per se violations of ERISA regardless of the motivation which initiated the transaction, the prudence of the transaction, or the absence of any harm arising from the transaction.'" *Gray v. Briggs*, 45 F. Supp. 2d 316, 326 (S.D.N.Y. 1997) (quoting *Reich v. Polera Bldg. Corp.,* 1996 U.S. Dist. LEXIS 1365, at *7-8 (S.D.N.Y. Feb. 9, 1996)).

363.    And although that section speaks in terms of restrictions on fiduciaries, "[t]he Supreme Court has held that equitable claims based on [§1106(a)(1)] violations may be brought against non-fiduciaries under [29 U.S.C. § 1132(a)(3)]." *Patrico v. Voya Fin., Inc.,* 2017 U.S. Dist. LEXIS 95735, at *12-13 (S.D.N.Y. June 20, 2017) (citing *Harris*, 530 U.S. at 245-51).

364.    Therefore, Plaintiffs seek remedies available to them and the Plan to remedy the prohibited transactions.

### COUNT IV

**BREACH OF DUTIES OF LOYALTY AND PRUDENCE BY FAILING TO FOLLOW THE TERMS OF THE PLAN DOCUMENT AND GOVERNING INSTRUMENTS UNDER 29 U.S.C. § 1104(a)(1)(D).**

365.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

76

366.    29 U.S.C. § 1104 imposes the fiduciary duties of prudence and loyalty upon Defendants in adhering to the written provisions of the documents and instruments governing the plan, insofar as those instruments are otherwise in accordance with ERISA.

367.    A plan may be disqualified from favorable tax treatment for operational failures, which occur if a plan fails to operate in accordance with statutory requirements, or if it fails to follow the terms of the plan document. 26 U.S.C. §§ 401 (a), 501(a).

368.    Defendants failed to take any corrective action in response to imprudent funds that had been contained in the Plan portfolio. Such corrective action is required by the Plan document. This would have been easy for Defendants to do under correction programs offered by both the IRS and the Department of Labor.

369.    Defendants failed to allocate Plan administrative expenses in a reasonable, uniform, and non-discriminatory way, which violated the Plan document.

370.    Along the same vein, Defendants failed to adopt or follow an expense policy, the absence of which undoubtedly resulted in the overly excessive fees and other charges imposed on Plan participants by Defendants and CSPs.

371.    Had Defendants adhered to their governing plan documents as ERISA requires, many of the breaches detailed previously in this Complaint may not have occurred, or the consequences of them may have been lessened. Defendants chose not to follow the document's provisions, in violation of their fiduciary duties.

372.    Once Plaintiffs obtain the official Plan document, a more formal and precise list of Defendants' violations of the document can be asserted.

373.    Repeated failure to follow the guidelines of the plan document compounded the already-existing issues surrounding Plan administration and investment decision described in this Complaint, allowing them to proceed to even worse degrees.

374.    Defendants' actions directly and proximately caused substantial harm to Plaintiffs and the proposed Class, and as a result, Defendants are liable for all resulting loss and financial damages. Plaintiffs seek remedies available to them under these circumstances, including reimbursement for all losses, injunctive relief, and removal of the Plan's managers.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

1)  Find and declare that Defendants have breached their fiduciary duties as described above;

2)  Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties or prohibited transaction, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duties;

3)  Determine the method by which plan losses and fiduciary profits should be calculated, and order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

4)  Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

5) Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;

6) Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

7) Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

8) Order equitable restitution against the Defendants;

9) Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Fitzgerald Litigation as Lead Class Counsel;

10) Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

11) Allow a jury trial on any matter herein, if any, trial by a jury. Plaintiffs are aware that under ERISA a jury trial is, under existing law, not permitted. However, Plaintiff makes the jury demand to preserve the right to a jury should there be a change in law or amendment to the pleadings that makes a jury trial permissible in the future;

12) Order the payment of interest to the extent it is allowed by law; and

13) Grant other equitable or remedial relief as the Court deems appropriate.

Date:   August 18, 2021

Respectfully submitted,

  /s/ Andrew L. Fitzgerald
ANDREW L. FITZGERALD
N.C. State Bar No. 31522
andy@fitzgeraldlitigation.com
**FITZGERALD LITIGATION**
119 Brookstown Avenue, Suite 402
Winston-Salem, NC 27101
Telephone: 336-793-4696
Fax:  336-793-4698

## CERTFICATE OF SERVICE

I hereby certify that on August 18, 2021, I electronically filed the above Amended Complaint with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record at the email address(es) listed below:

Rene E. Thorne
Jackson Lewis, P.C.
650 Poydras Street
Suite 1900
New Orleans, LA 70130
Rene.thorne@jacksonlewis.com
*Attorney for Defendants*

  */s/ Andrew Fitzgerald*
Andrew L. Fitzgerald